# WASHINGTON ET AL. *v.* GLUCKSBERG ET AL.

No. 96–110.   Argued January 8, 1997—Decided June 26, 1997

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed a
concurring opinion, in which GINSBURG and BREYER, JJ., joined in part,
*post*, p. 736. STEVENS, J., *post*, p. 738, SOUTER, J., *post*, p. 752, GINSBURG,
J., *post*, p. 789, and BREYER, J., *post*, p. 789, filed opinions concurring in
the judgment.

*William L. Williams*, Senior Assistant Attorney General
of Washington, argued the cause for petitioners. With him
on the briefs were *Christine O. Gregoire*, Attorney General,
and *William Berggren Collins*, Senior Assistant Attorney
General.

*Acting Solicitor General Dellinger* argued the cause for
the United States as *amicus curiae* urging reversal. With
him on the brief were *Assistant Attorney General Hunger,
Deputy Solicitor General Waxman, Deputy Assistant At-
torney General Preston, Irving L. Gornstein*, and *Barbara
C. Biddle.*

*Kathryn L. Tucker* argued the cause for respondents.
With her on the brief were *David J. Burman, Kari Anne
Smith*, and *Laurence H. Tribe.*\*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Cali-
fornia et al. by *Daniel E. Lungren*, Attorney General of California, *Robert
L. Mukai*, Chief Assistant Attorney General, *Alvin J. Korobkin*, Senior
Assistant Attorney General, *Thomas S. Lazar*, Deputy Attorney General,
and by the Attorneys General for their respective jurisdictions as follows:
*Jeff Sessions* of Alabama, *Gale A. Norton* of Colorado, *Robert A. Butter-
worth* of Florida, *Michael J. Bowers* of Georgia, *James E. Ryan* of Illinois,
*Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Cur-*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented in this case is whether Washington's prohibition against "caus[ing]" or "aid[ing]" a suicide

ran, Jr., of Maryland, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Jeffrey R. Howard* of New Hampshire, *Dennis C. Vacco* of New York, *Pedro R. Pierluisi* of Puerto Rico, *Charles Molony Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *Charles W. Burson* of Tennessee, and *James S. Gilmore III* of Virginia; for the State of Oregon by *Theodore R. Kulongoski*, Attorney General, *Thomas A. Balmer*, Deputy Attorney General, *Virginia L. Linder*, Solicitor General, and *Stephen K. Bushong*, Assistant Attorney General; for Wayne County, Michigan, by *John D. O'Hair* and *Timothy A. Baughman;* for the District Attorney of Milwaukee County, Wisconsin, by *E. Michael McCann, pro se*, and *John M. Stoiber;* for Agudath Israel of America by *David Zwiebel* and *Morton M. Avigdor;* for the American Association of Homes and Services for the Aging et al. by *Joel G. Chefitz* and *Robert K. Niewijk;* for the American Center for Law and Justice by *Jay Alan Sekulow, James M. Henderson, Sr., Walter M. Weber, Keith A. Fournier, John G. Stepanovich*, and *Thomas P. Monaghan;* for the American Geriatrics Society by *John H. Pickering* and *Joseph E. Schmitz;* for the American Hospital Association by *Michael K. Kellogg* and *Margaret J. Hardy;* for the American Medical Association et al. by *Carter G. Phillips, Mark E. Haddad, Paul E. Kalb, Katherine L. Adams, Kirk B. Johnson*, and *Michael L. Ile;* for the American Suicide Foundation by *Ellen H. Moskowitz, Edward R. Grant*, and *John F. Cannon;* for the Catholic Health Association of the United States by *James A. Serritella, James C. Geoly, Kevin R. Gustafson, Thomas C. Shields, Peter M. Leibold*, and *Charles S. Gilham;* for the Catholic Medical Association by *Joseph J. Frank, Sergio Alvarez-Mena III*, and *Peter Buscemi;* for the Christian Legal Society et al. by *Edward J. Larson, Kimberlee Wood Colby*, and *Steven T. McFarland;* for the Evangelical Lutheran Church in America by *Edward McGlynn Gaffney, Jr., Susan D. Reece Martyn, Henry J. Bourguignon*, and *Phillip H. Harris;* for the Family Research Council by *Cathleen A. Cleaver, Mark A. Rothe*, and *Edward R. Grant;* for the Institute for Public Affairs of the Union of Orthodox Jewish Congregations of America et al. by *Richard B. Stone;* for the Legal Center for Defense of Life, Inc., et al. by *Dwight G. Duncan* and *Michael P. Tierney;* for the National Association of Prolife Nurses et al. by *Jacqulyn Kay Hall;* for the National Catholic Office for Persons with Disabilities et al. by *James Bopp, Jr., Thomas J. Marzen, Daniel Avila*, and *Jane E. T. Brockmann;* for the National Hospice Organization by *E. Barrett Petty-*

offends the Fourteenth Amendment to the United States Constitution. We hold that it does not.

It has always been a crime to assist a suicide in the State of Washington. In 1854, Washington's first Territorial Leg-

man, Jr.; for the National Legal Center for the Medically Dependent & Disabled, Inc., et al. by *James Bopp, Jr., Thomas J. Marzen, Daniel Avila,* and *Jane E. T. Brockmann;* for the National Right to Life Committee, Inc., by *James Bopp, Jr.,* and *Richard E. Coleson;* for the National Spinal Cord Injury Association, Inc., by *Leonard F. Zandrow, Jr.,* and *Calum B. Anderson;* for the Project on Death in America et al. by *Robert A. Burt;* for the Rutherford Institute by *Gregory D. Smith* and *John W. Whitehead;* for the Schiller Institute by *Max Dean;* for the United States Catholic Conference et al. by *Mark E. Chopko;* for Senator Orrin Hatch et al. by *Michael W. McConnell;* for Members of the New York and Washington State Legislatures by *Paul Benjamin Linton* and *Clarke D. Forsythe;* for Bioethics Professors by *George J. Annas;* for Gary Lee, M. D., et al. by *James Bopp, Jr., Bary A. Bostrom,* and *Richard E. Coleson;* and for Richard Thompson by *Mr. Thompson,* pro se, and *Richard H. Browne.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Cameron Clark, Karen E. Boxx,* and *Steven R. Shapiro;* for Americans for Death with Dignity et al. by *John R. Reese* and *Page R. Barnes;* for the American Medical Student Association et al. by *John H. Hall;* for the Center for Reproductive Law & Policy by *Janet Benshoof* and *Kathryn Kolbert;* for the Coalition of Hospice Professionals by *Gerald A. Rosenberg* and *Frances Kulka Browne;* for the Council for Secular Humanism et al. by *Ronald A. Lindsay;* for Gay Men's Health Crisis et al. by *Andrew I. Batavia;* for the National Women's Health Network et al. by *Sylvia A. Law;* for 36 Religious Organizations, Leaders, and Scholars by *Barbara McDowell* and *Gregory A. Castanias;* for the Washington State Psychological Association et al. by *Edward C. DuMont;* for Bioethicists by *Martin R. Gold* and *Robert P. Mulvey;* for Law Professors by *Charles H. Baron, David A. Hoffman,* and *Joshua M. Davis;* for State Legislators by *Sherry F. Colb;* and for Julian M. Whitaker, M. D., by *Jonathan W. Emord.*

Briefs of *amici curiae* were filed for the American College of Legal Medicine by *Miles J. Zaremski, Bruce C. Nelson,* and *Ila S. Rothschild;* for the International Anti-Euthanasia Task Force by *Wesley J. Smith;* for the Southern Center for Law and Ethics by *Tony G. Miller;* for Surviving Family Members in Support of Physician-Assisted Dying by *Katrin E. Frank, Robert A. Free,* and *Kathleen Wareham;* and for Ronald Dworkin et al. by *Mr. Dworkin,* pro se, *Peter L. Zimroth, Philip H. Curtis, Kent A. Yalowitz, Anand Agneshwar,* and *Abe Krash.*

islature outlawed "assisting another in the commission of self-murder."[1]  Today, Washington law provides: "A person is guilty of promoting a suicide attempt when he knowingly causes or aids another person to attempt suicide."  Wash. Rev. Code § 9A.36.060(1) (1994).  "Promoting a suicide attempt" is a felony, punishable by up to five years' imprisonment and up to a $10,000 fine.  §§ 9A.36.060(2) and 9A.20.021(1)(c).  At the same time, Washington's Natural Death Act, enacted in 1979, states that the "withholding or withdrawal of life-sustaining treatment" at a patient's direction "shall not, for any purpose, constitute a suicide."  Wash. Rev. Code § 70.122.070(1).[2]

Petitioners in this case are the State of Washington and its Attorney General.  Respondents Harold Glucksberg, M. D., Abigail Halperin, M. D., Thomas A. Preston, M. D., and Peter Shalit, M. D., are physicians who practice in Washington. These doctors occasionally treat terminally ill, suffering patients, and declare that they would assist these patients in ending their lives if not for Washington's assisted-suicide ban.[3]  In January 1994, respondents, along with three gravely ill, pseudonymous plaintiffs who have since died and

[1] Act of Apr. 28, 1854, § 17, 1854 Wash. Laws 78 ("Every person deliberately assisting another in the commission of self-murder, shall be deemed guilty of manslaughter"); see also Act of Dec. 2, 1869, § 17, 1869 Wash. Laws 201; Act of Nov. 10, 1873, § 19, 1873 Wash. Laws 184; Criminal Code, ch. 249, §§ 135–136, 1909 Wash. Laws, 11th Sess., 929.

[2] Under Washington's Natural Death Act, "adult persons have the fundamental right to control the decisions relating to the rendering of their own health care, including the decision to have life-sustaining treatment withheld or withdrawn in instances of a terminal condition or permanent unconscious condition."  Wash. Rev. Code § 70.122.010 (1994).  In Washington, "[a]ny adult person may execute a directive directing the withholding or withdrawal of life-sustaining treatment in a terminal condition or permanent unconscious condition," § 70.122.030, and a physician who, in accordance with such a directive, participates in the withholding or withdrawal of life-sustaining treatment is immune from civil, criminal, or professional liability, § 70.122.051.

[3] Glucksberg Declaration, App. 35; Halperin Declaration, id., at 49–50; Preston Declaration, id., at 55–56; Shalit Declaration, id., at 73–74.

Compassion in Dying, a nonprofit organization that counsels people considering physician-assisted suicide, sued in the United States District Court, seeking a declaration that Wash. Rev. Code § 9A.36.060(1) (1994) is, on its face, unconstitutional. *Compassion in Dying* v. *Washington*, 850 F. Supp. 1454, 1459 (WD Wash. 1994).[4]

The plaintiffs asserted "the existence of a liberty interest protected by the Fourteenth Amendment which extends to a personal choice by a mentally competent, terminally ill adult to commit physician-assisted suicide." *Ibid.* Relying primarily on *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), and *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261 (1990), the District Court agreed, 850 F. Supp., at 1459–1462, and concluded that Washington's assisted-suicide ban is unconstitutional because it "places an undue burden on the exercise of [that] constitutionally protected liberty interest." *Id.*, at 1465.[5] The District Court also decided that the Washington statute violated the Equal Protection Clause's requirement that " 'all persons similarly situated . . . be treated alike.' " *Id.*, at 1466 (quoting *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 439 (1985)).

A panel of the Court of Appeals for the Ninth Circuit reversed, emphasizing that "[i]n the two hundred and five years of our existence no constitutional right to aid in killing

---

[4] John Doe, Jane Roe, and James Poe, plaintiffs in the District Court, were then in the terminal phases of serious and painful illnesses. They declared that they were mentally competent and desired assistance in ending their lives. Declaration of Jane Roe, *id.*, at 23–25; Declaration of John Doe, *id.*, at 27–28; Declaration of James Poe, *id.*, at 30–31; *Compassion in Dying*, 850 F. Supp., at 1456–1457.

[5] The District Court determined that *Casey*'s "undue burden" standard, 505 U. S., at 874 (joint opinion), not the standard from *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) (requiring a showing that "no set of circumstances exists under which the [law] would be valid"), governed the plaintiffs' facial challenge to the assisted-suicide ban. 850 F. Supp., at 1462–1464.

oneself has ever been asserted and upheld by a court of final jurisdiction." *Compassion in Dying* v. *Washington*, 49 F. 3d 586, 591 (1995). The Ninth Circuit reheard the case en banc, reversed the panel's decision, and affirmed the District Court. *Compassion in Dying* v. *Washington*, 79 F. 3d 790, 798 (1996). Like the District Court, the en banc Court of Appeals emphasized our *Casey* and *Cruzan* decisions. 79 F. 3d, at 813–816. The court also discussed what it described as "historical" and "current societal attitudes" toward suicide and assisted suicide, *id.*, at 806–812, and concluded that "the Constitution encompasses a due process liberty interest in controlling the time and manner of one's death—that there is, in short, a constitutionally-recognized 'right to die.'" *Id.*, at 816. After "[w]eighing and then balancing" this interest against Washington's various interests, the court held that the State's assisted-suicide ban was unconstitutional "as applied to terminally ill competent adults who wish to hasten their deaths with medication prescribed by their physicians." *Id.*, at 836, 837.[6] The court did not reach the District Court's equal protection holding. *Id.*, at 838.[7] We granted certiorari, 518 U. S. 1057 (1996), and now reverse.

---

[6] Although, as JUSTICE STEVENS observes, *post*, at 739 (opinion concurring in judgments), "[the court's] analysis and eventual holding that the statute was unconstitutional was not limited to a particular set of plaintiffs before it," the court did note that "[d]eclaring a statute unconstitutional as applied to members of a group is atypical but not uncommon." 79 F. 3d, at 798, n. 9, and emphasized that it was "not deciding the facial validity of [the Washington statute]," *id.*, at 797–798, and nn. 8–9. It is therefore the court's holding that Washington's physician-assisted suicide statute is unconstitutional as applied to the "class of terminally ill, mentally competent patients," *post*, at 750 (STEVENS, J., concurring in judgments), that is before us today.

[7] The Court of Appeals did note, however, that "the equal protection argument relied on by [the District Court] is not insubstantial," 79 F. 3d, at 838, n. 139, and sharply criticized the opinion in a separate case then pending before the Ninth Circuit, *Lee* v. *Oregon*, 891 F. Supp. 1429 (Ore. 1995) (Oregon's Death With Dignity Act, which permits physician-assisted

## I

We begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices. See, e. g., *Casey, supra,* at 849–850; *Cruzan, supra,* at 269–279; *Moore* v. *East Cleveland,* 431 U. S. 494, 503 (1977) (plurality opinion) (noting importance of "careful 'respect for the teachings of history'"). In almost every State—indeed, in almost every western democracy—it is a crime to assist a suicide.[8] The States' assisted-suicide bans are not innovations. Rather, they are longstanding expressions of the States' commitment to the protection and preservation of all human life. *Cruzan, supra,* at 280 ("[T]he States—indeed, all civilized nations—demonstrate their commitment to life by treating homicide as a serious crime. Moreover, the major-

---

suicide, violates the Equal Protection Clause because it does not provide adequate safeguards against abuse), vacated, *Lee* v. *Oregon,* 107 F. 3d 1382 (CA9 1997) (concluding that plaintiffs lacked Article III standing). *Lee,* of course, is not before us, any more than it was before the Court of Appeals below, and we offer no opinion as to the validity of the *Lee* courts' reasoning. In *Vacco* v. *Quill, post,* p. 793, however, decided today, we hold that New York's assisted-suicide ban does not violate the Equal Protection Clause.

[8] See *Compassion in Dying* v. *Washington,* 79 F. 3d 790, 847, and nn. 10–13 (CA9 1996) (Beezer, J., dissenting) ("In total, forty-four states, the District of Columbia and two territories prohibit or condemn assisted suicide") (citing statutes and cases); *Rodriguez* v. *British Columbia (Attorney General),* 107 D. L. R. (4th) 342, 404 (Can. 1993) ("[A] blanket prohibition on assisted suicide . . . is the norm among western democracies") (discussing assisted-suicide provisions in Austria, Spain, Italy, the United Kingdom, the Netherlands, Denmark, Switzerland, and France). Since the Ninth Circuit's decision, Louisiana, Rhode Island, and Iowa have enacted statutory assisted-suicide bans. La. Rev. Stat. Ann. § 14:32.12 (West Supp. 1997); R. I. Gen. Laws §§ 11–60–1, 11–60–3 (Supp. 1996); Iowa Code Ann. §§ 707A.2, 707A.3 (Supp. 1997). For a detailed history of the States' statutes, see Marzen, O'Dowd, Crone, & Balch, Suicide: A Constitutional Right?, 24 Duquesne L. Rev. 1, 148–242 (1985) (App.) (hereinafter Marzen).

ity of States in this country have laws imposing criminal penalties on one who assists another to commit suicide"); see *Stanford* v. *Kentucky,* 492 U. S. 361, 373 (1989) ("[T]he primary and most reliable indication of [a national] consensus is . . . the pattern of enacted laws"). Indeed, opposition to and condemnation of suicide—and, therefore, of assisting suicide—are consistent and enduring themes of our philosophical, legal, and cultural heritages. See generally Marzen 17–56; New York State Task Force on Life and the Law, When Death is Sought: Assisted Suicide and Euthanasia in the Medical Context 77–82 (May 1994) (hereinafter New York Task Force).

More specifically, for over 700 years, the Anglo-American common-law tradition has punished or otherwise disapproved of both suicide and assisting suicide.[9] *Cruzan,* 497 U. S., at 294–295 (SCALIA, J., concurring). In the 13th century, Henry de Bracton, one of the first legal-treatise writers, observed that "[j]ust as a man may commit felony by slaying another so may he do so by slaying himself." 2 Bracton on Laws and Customs of England 423 (f. 150) (G. Woodbine ed., S. Thorne transl., 1968). The real and personal property of one who killed himself to avoid conviction and punishment for a crime were forfeit to the King; however, thought Bracton, "if a man slays himself in weariness of life or because he is unwilling to endure further bodily pain . . . [only] his movable goods [were] confiscated." *Id.,* at 423–424 (f. 150). Thus, "[t]he principle that suicide of a sane person, for whatever reason, was a punishable felony was . . . introduced into

[9] The common law is thought to have emerged through the expansion of pre-Norman institutions sometime in the 12th century. J. Baker, An Introduction to English Legal History 11 (2d ed. 1979). England adopted the ecclesiastical prohibition on suicide five centuries earlier, in the year 673 at the Council of Hereford, and this prohibition was reaffirmed by King Edgar in 967. See G. Williams, The Sanctity of Life and the Criminal Law 257 (1957).

English common law."[10]  Centuries later, Sir William Blackstone, whose Commentaries on the Laws of England not only provided a definitive summary of the common law but was also a primary legal authority for 18th- and 19th-century American lawyers, referred to suicide as "self-murder" and "the pretended heroism, but real cowardice, of the Stoic philosophers, who destroyed themselves to avoid those ills which they had not the fortitude to endure . . . ."  4 W. Blackstone, Commentaries *189.  Blackstone emphasized that "the law has . . . ranked [suicide] among the highest crimes," *ibid.*, although, anticipating later developments, he conceded that the harsh and shameful punishments imposed for suicide "borde[r] a little upon severity."  *Id.*, at *190.

For the most part, the early American Colonies adopted the common-law approach.  For example, the legislators of the Providence Plantations, which would later become Rhode Island, declared, in 1647, that "[s]elf-murder is by all agreed to be the most unnatural, and it is by this present Assembly declared, to be that, wherein he that doth it, kills himself out

---

[10] Marzen 59.  Other late-medieval treatise writers followed and restated Bracton; one observed that "man-slaughter" may be "[o]f [one]self; as in case, when people hang themselves or hurt themselves, or otherwise kill themselves of their own felony" or "[o]f others; as by beating, famine, or other punishment; in like cases, all are man-slayers."  A. Horne, The Mirrour of Justices, ch. 1, §9, pp. 41–42 (W. Robinson ed. 1903).  By the mid-16th century, the Court at Common Bench could observe that "[suicide] is an Offence against Nature, against God, and against the King. . . . [T]o destroy one's self is contrary to Nature, and a Thing most horrible."  *Hales* v. *Petit*, 1 Plowd. Com. 253, 261, 75 Eng. Rep. 387, 400 (1561–1562).

In 1644, Sir Edward Coke published his Third Institute, a lodestar for later common lawyers.  See T. Plucknett, A Concise History of the Common Law 281–284 (5th ed. 1956).  Coke regarded suicide as a category of murder, and agreed with Bracton that the goods and chattels—but not, for Coke, the lands—of a sane suicide were forfeit.  3 E. Coke, Institutes *54.  William Hawkins, in his 1716 Treatise of the Pleas of the Crown, followed Coke, observing that "our laws have always had . . . an abhorrence of this crime."  1 W. Hawkins, Pleas of the Crown, ch. 27, §4, p. 164 (T. Leach ed. 1795).

of a premeditated hatred against his own life or other humor: . . . his goods and chattels are the king's custom, but not his debts nor lands; but in case he be an infant, a lunatic, mad or distracted man, he forfeits nothing." The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations 1647–1719, p. 19 (J. Cushing ed. 1977). Virginia also required ignominious burial for suicides, and their estates were forfeit to the Crown. A. Scott, Criminal Law in Colonial Virginia 108, and n. 93, 198, and n. 15 (1930).

Over time, however, the American Colonies abolished these harsh common-law penalties. William Penn abandoned the criminal-forfeiture sanction in Pennsylvania in 1701, and the other Colonies (and later, the other States) eventually followed this example. *Cruzan, supra,* at 294 (SCALIA, J., concurring). Zephaniah Swift, who would later become Chief Justice of Connecticut, wrote in 1796:

> "There can be no act more contemptible, than to attempt to punish an offender for a crime, by exercising a mean act of revenge upon lifeless clay, that is insensible of the punishment. There can be no greater cruelty, than the inflicting [of] a punishment, as the forfeiture of goods, which must fall solely on the innocent offspring of the offender. . . . [Suicide] is so abhorrent to the feelings of mankind, and that strong love of life which is implanted in the human heart, that it cannot be so frequently committed, as to become dangerous to society. There can of course be no necessity of any punishment." 2 Z. Swift, A System of the Laws of the State of Connecticut 304 (1796).

This statement makes it clear, however, that the movement away from the common law's harsh sanctions did not represent an acceptance of suicide; rather, as Chief Justice Swift observed, this change reflected the growing consensus that it was unfair to punish the suicide's family for his wrongdoing. *Cruzan, supra,* at 294 (SCALIA, J., concurring). Nonethe-

less, although States moved away from Blackstone's treatment of suicide, courts continued to condemn it as a grave public wrong. See, e. g., *Bigelow* v. *Berkshire Life Ins. Co.*, 93 U. S. 284, 286 (1876) (suicide is "an act of criminal self-destruction"); *Von Holden* v. *Chapman*, 87 App. Div. 2d 66, 70–71, 450 N. Y. S. 2d 623, 626–627 (1982); *Blackwood* v. *Jones*, 111 Fla. 528, 532, 149 So. 600, 601 (1933) ("No sophistry is tolerated . . . which seek[s] to justify self-destruction as commendable or even a matter of personal right").

That suicide remained a grievous, though nonfelonious, wrong is confirmed by the fact that colonial and early state legislatures and courts did not retreat from prohibiting assisting suicide. Swift, in his early 19th-century treatise on the laws of Connecticut, stated that "[i]f one counsels another to commit suicide, and the other by reason of the advice kills himself, the advisor is guilty of murder as principal." 2 Z. Swift, A Digest of the Laws of the State of Connecticut 270 (1823). This was the well-established common-law view, see *In re Joseph G.*, 34 Cal. 3d 429, 434–435, 667 P. 2d 1176, 1179 (1983); *Commonwealth* v. *Mink*, 123 Mass. 422, 428 (1877) (" 'Now if the murder of one's self is felony, the accessory is equally guilty as if he had aided and abetted in the murder' ") (quoting Chief Justice Parker's charge to the jury in *Commonwealth* v. *Bowen*, 13 Mass. 356 (1816)), as was the similar principle that the consent of a homicide victim is "wholly immaterial to the guilt of the person who cause[d] [his death]," 3 J. Stephen, A History of the Criminal Law of England 16 (1883); see 1 F. Wharton, Criminal Law §§ 451–452 (9th ed. 1885); *Martin* v. *Commonwealth*, 184 Va. 1009, 1018–1019, 37 S. E. 2d 43, 47 (1946) (" 'The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable' "). And the prohibitions against assisting suicide never contained exceptions for those who were near death. Rather, "[t]he life of those to whom life ha[d] become a burden—of those who [were] hopelessly diseased or fatally wounded—nay, even the lives of criminals

condemned to death, [were] under the protection of the law, equally as the lives of those who [were] in the full tide of life's enjoyment, and anxious to continue to live." *Blackburn* v. *State*, 23 Ohio St. 146, 163 (1872); see *Bowen, supra,* at 360 (prisoner who persuaded another to commit suicide could be tried for murder, even though victim was scheduled shortly to be executed).

The earliest American statute explicitly to outlaw assisting suicide was enacted in New York in 1828, Act of Dec. 10, 1828, ch. 20, §4, 1828 N. Y. Laws 19 (codified at 2 N. Y. Rev. Stat. pt. 4, ch. 1, Tit. 2, Art. 1, §7, p. 661 (1829)), and many of the new States and Territories followed New York's example. Marzen 73–74. Between 1857 and 1865, a New York commission led by Dudley Field drafted a criminal code that prohibited "aiding" a suicide and, specifically, "furnish[ing] another person with any deadly weapon or poisonous drug, knowing that such person intends to use such weapon or drug in taking his own life." *Id.,* at 76–77. By the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide. See *Cruzan,* 497 U. S., at 294–295 (SCALIA, J., concurring). The Field Penal Code was adopted in the Dakota Territory in 1877 and in New York in 1881, and its language served as a model for several other western States' statutes in the late 19th and early 20th centuries. Marzen 76–77, 205–206, 212–213. California, for example, codified its assisted-suicide prohibition in 1874, using language similar to the Field Code's.[11] In this century, the Model Penal Code also prohibited "aiding" suicide, prompting many States to enact or revise their assisted-suicide

---

[11] In 1850, the California Legislature adopted the English common law, under which assisting suicide was, of course, a crime. Act of Apr. 13, 1850, ch. 95, 1850 Cal. Stats. 219. The provision adopted in 1874 provided that "[e]very person who deliberately aids or advises, or encourages another to commit suicide, is guilty of a felony." Act of Mar. 30, 1874, ch. 614, §13,400 (codified at Cal. Penal Code §400 (T. Hittel ed. 1876)).

bans.[12]  The code's drafters observed that "the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request, of the suicide victim." American Law Institute, Model Penal Code § 210.5, Comment 5, p. 100 (Official Draft and Revised Comments 1980).

Though deeply rooted, the States' assisted-suicide bans have in recent years been reexamined and, generally, reaffirmed.  Because of advances in medicine and technology, Americans today are increasingly likely to die in institutions, from chronic illnesses.  President's Comm'n for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 16–18 (1983).  Public concern and democratic action are therefore sharply focused on how best to protect dignity and independence at the end of life, with the result that there have been many significant changes in state laws and in the attitudes these laws reflect.  Many States, for example, now permit "living wills," surrogate health-care decisionmaking, and the withdrawal or refusal of life-sustaining medical treatment.  See *Vacco* v. *Quill, post,* at 804–806; 79 F. 3d, at 818–820; *People* v. *Kevorkian,* 447 Mich. 436, 478–480, and nn. 53–56, 527 N. W. 2d 714, 731–732, and nn. 53–56 (1994). At the same time, however, voters and legislators continue for the most part to reaffirm their States' prohibitions on assisting suicide.

The Washington statute at issue in this case, Wash. Rev. Code § 9A.36.060 (1994), was enacted in 1975 as part of a revision of that State's criminal code.  Four years later,

---

[12] "A person who purposely aids or solicits another to commit suicide is guilty of a felony in the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a misdemeanor." American Law Institute, Model Penal Code § 210.5(2) (Official Draft and Revised Comments 1980).

Washington passed its Natural Death Act, which specifically stated that the "withholding or withdrawal of life-sustaining treatment . . . shall not, for any purpose, constitute a suicide" and that "[n]othing in this chapter shall be construed to condone, authorize, or approve mercy killing . . . ." Natural Death Act, 1979 Wash. Laws, ch. 112, § 8(1), p. 11 (codified at Wash. Rev. Code §§ 70.122.070(1), 70.122.100 (1994)). In 1991, Washington voters rejected a ballot initiative which, had it passed, would have permitted a form of physician-assisted suicide.[13] Washington then added a provision to the Natural Death Act expressly excluding physician-assisted suicide. 1992 Wash. Laws, ch. 98, § 10; Wash. Rev. Code § 70.122.100 (1994).

California voters rejected an assisted-suicide initiative similar to Washington's in 1993. On the other hand, in 1994, voters in Oregon enacted, also through ballot initiative, that State's "Death With Dignity Act," which legalized physician-assisted suicide for competent, terminally ill adults.[14] Since the Oregon vote, many proposals to legalize assisted-suicide have been and continue to be introduced in the States' legislatures, but none has been enacted.[15] And

---

[13] Initiative 119 would have amended Washington's Natural Death Act, Wash. Rev. Code § 70.122.010 et seq. (1994), to permit "aid-in-dying," defined as "aid in the form of a medical service provided in person by a physician that will end the life of a conscious and mentally competent qualified patient in a dignified, painless and humane manner, when requested voluntarily by the patient through a written directive in accordance with this chapter at the time the medical service is to be provided." App. H to Pet. for Cert. 3–4.

[14] Ore. Rev. Stat. § 127.800 et seq. (1996); Lee v. Oregon, 891 F. Supp. 1429 (Ore. 1995) (Oregon Act does not provide sufficient safeguards for terminally ill persons and therefore violates the Equal Protection Clause), vacated, Lee v. Oregon, 107 F. 3d 1382 (CA9 1997).

[15] See, e. g., Alaska H. B. 371 (1996); Ariz. S. B. 1007 (1996); Cal. A. B. 1080, A. B. 1310 (1995); Colo. H. B. 1185 (1996); Colo. H. B. 1308 (1995); Conn. H. B. 6298 (1995); Ill. H. B. 691, S. B. 948 (1997); Me. H. P. 663 (1997); Me. H. P. 552 (1995); Md. H. B. 474 (1996); Md. H. B. 933 (1995); Mass. H. B. 3173 (1995); Mich. H. B. 6205, S. B. 556 (1996); Mich. H. B. 4134

just last year, Iowa and Rhode Island joined the overwhelming majority of States explicitly prohibiting assisted suicide. See Iowa Code Ann. §§ 707A.2, 707A.3 (Supp. 1997); R. I. Gen. Laws §§ 11–60–1, 11–60–3 (Supp. 1996). Also, on April 30, 1997, President Clinton signed the Federal Assisted Suicide Funding Restriction Act of 1997, which prohibits the use of federal funds in support of physician-assisted suicide. Pub. L. 105–12, 111 Stat. 23 (codified at 42 U. S. C. § 14401 et seq.).[16]

---

(1995); Miss. H. B. 1023 (1996); N. H. H. B. 339 (1995); N. M. S. B. 446 (1995); N. Y. S. B. 5024, A. B. 6333 (1995); Neb. L. B. 406 (1997); Neb. L. B. 1259 (1996); R. I. S. 2985 (1996); Vt. H. B. 109 (1997); Vt. H. B. 335 (1995); Wash. S. B. 5596 (1995); Wis. A. B. 174, S. B. 90 (1995); Senate of Canada, Of Life and Death, Report of the Special Senate Committee on Euthanasia and Assisted Suicide A–156 (June 1995) (describing unsuccessful proposals, between 1991–1994, to legalize assisted suicide).

[16] Other countries are embroiled in similar debates: The Supreme Court of Canada recently rejected a claim that the Canadian Charter of Rights and Freedoms establishes a fundamental right to assisted suicide, *Rodriguez* v. *British Columbia (Attorney General),* 107 D. L. R. (4th) 342 (1993); the British House of Lords Select Committee on Medical Ethics refused to recommend any change in Great Britain's assisted-suicide prohibition, House of Lords, Session 1993–94 Report of the Select Committee on Medical Ethics, 12 Issues in Law & Med. 193, 202 (1996) ("We identify no circumstances in which assisted suicide should be permitted"); New Zealand's Parliament rejected a proposed "Death With Dignity Bill" that would have legalized physician-assisted suicide in August 1995, Graeme, MPs Throw out Euthanasia Bill, The Dominion (Wellington), Aug. 17, 1995, p. 1; and the Northern Territory of Australia legalized assisted suicide and voluntary euthanasia in 1995, see Shenon, Australian Doctors Get Right to Assist Suicide, N. Y. Times, July 28, 1995, p. A8. As of February 1997, three persons had ended their lives with physician assistance in the Northern Territory. Mydans, Assisted Suicide: Australia Faces a Grim Reality, N. Y. Times, Feb. 2, 1997, p. A3. On March 24, 1997, however, the Australian Senate voted to overturn the Northern Territory's law. Thornhill, Australia Repeals Euthanasia Law, Washington Post, Mar. 25, 1997, p. A14; see Euthanasia Laws Act 1997, No. 17, 1997 (Austl.). On the other hand, on May 20, 1997, Colombia's Constitutional Court legalized voluntary euthanasia for terminally ill people. C–239/97 de Mayo 20, 1997, Corte

Thus, the States are currently engaged in serious, thoughtful examinations of physician-assisted suicide and other similar issues. For example, New York State's Task Force on Life and the Law—an ongoing, blue-ribbon commission composed of doctors, ethicists, lawyers, religious leaders, and interested laymen—was convened in 1984 and commissioned with "a broad mandate to recommend public policy on issues raised by medical advances." New York Task Force vii. Over the past decade, the Task Force has recommended laws relating to end-of-life decisions, surrogate pregnancy, and organ donation. *Id.*, at 118–119. After studying physician-assisted suicide, however, the Task Force unanimously concluded that "[l]egalizing assisted suicide and euthanasia would pose profound risks to many individuals who are ill and vulnerable. . . . [T]he potential dangers of this dramatic change in public policy would outweigh any benefit that might be achieved." *Id.*, at 120.

Attitudes toward suicide itself have changed since Bracton, but our laws have consistently condemned, and continue to prohibit, assisting suicide. Despite changes in medical technology and notwithstanding an increased emphasis on the importance of end-of-life decisionmaking, we have not retreated from this prohibition. Against this backdrop of history, tradition, and practice, we now turn to respondents' constitutional claim.

## II

The Due Process Clause guarantees more than fair process, and the "liberty" it protects includes more than the absence of physical restraint. *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992) (Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them'") (quot-

---

Constitucional, M. P. Carlos Gaviria Diaz; see Colombia's Top Court Legalizes Euthanasia, Orlando Sentinel, May 22, 1997, p. A18.

ing *Daniels* v. *Williams,* 474 U. S. 327, 331 (1986)). The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. *Reno* v. *Flores,* 507 U. S. 292, 301–302 (1993); *Casey,* 505 U. S., at 851. In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving* v. *Virginia,* 388 U. S. 1 (1967); to have children, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942); to direct the education and upbringing of one's children, *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); to marital privacy, *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); to use contraception, *ibid.; Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); to bodily integrity, *Rochin* v. *California,* 342 U. S. 165 (1952), and to abortion, *Casey, supra.* We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. *Cruzan,* 497 U. S., at 278–279.

But we "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins,* 503 U. S., at 125. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," *ibid.,* lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court, *Moore,* 431 U. S., at 502 (plurality opinion).

Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively,

"deeply rooted in this Nation's history and tradition," *id.*, at 503 (plurality opinion); *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko* v. *Connecticut*, 302 U. S. 319, 325, 326 (1937). Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. *Flores, supra*, at 302; *Collins, supra*, at 125; *Cruzan, supra*, at 277–278. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decisionmaking," *Collins, supra*, at 125, that direct and restrain our exposition of the Due Process Clause. As we stated recently in *Flores*, the Fourteenth Amendment "forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." 507 U. S., at 302.

JUSTICE SOUTER, relying on Justice Harlan's dissenting opinion in *Poe* v. *Ullman*, 367 U. S. 497 (1961), would largely abandon this restrained methodology, and instead ask "whether [Washington's] statute sets up one of those 'arbitrary impositions' or 'purposeless restraints' at odds with the Due Process Clause of the Fourteenth Amendment," *post*, at 752 (quoting *Poe, supra*, at 543 (Harlan, J., dissenting)).[17]

---

[17] In JUSTICE SOUTER's opinion, Justice Harlan's *Poe* dissent supplies the "modern justification" for substantive-due-process review. *Post*, at 756, and n. 4 (opinion concurring in judgment). But although Justice Harlan's opinion has often been cited in due process cases, we have never abandoned our fundamental-rights-based analytical method. Just four Terms ago, six of the Justices now sitting joined the Court's opinion in *Reno* v. *Flores*, 507 U. S. 292, 301–305 (1993); *Poe* was not even cited. And in *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261 (1990), neither the Court's nor the concurring opinions relied on *Poe;* rather, we concluded that the right to refuse unwanted medical treatment was so rooted in our history, tradition, and practice as to require special protection under the

In our view, however, the development of this Court's substantive-due-process jurisprudence, described briefly *supra,* at 719–720, has been a process whereby the outlines of the "liberty" specially protected by the Fourteenth Amendment—never fully clarified, to be sure, and perhaps not capable of being fully clarified—have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition. This approach tends to rein in the subjective elements that are necessarily present in due process judicial review. In addition, by establishing a threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the action, it avoids the need for complex balancing of competing interests in every case.

Turning to the claim at issue here, the Court of Appeals stated that "[p]roperly analyzed, the first issue to be resolved is whether there is a liberty interest in determining the time and manner of one's death," 79 F. 3d, at 801, or, in other words, "[i]s there a right to die?," *id.,* at 799. Similarly, respondents assert a "liberty to choose how to die" and a right to "control of one's final days," Brief for Respondents 7, and describe the asserted liberty as "the right to choose a humane, dignified death," *id.,* at 15, and "the liberty to shape death," *id.,* at 18. As noted above, we have a tradition of carefully formulating the interest at stake in substantive-due-process cases. For example, although *Cruzan* is often described as a "right to die" case, see 79 F. 3d, at 799; *post,* at 745 (STEVENS, J., concurring in judgments) (*Cruzan* recognized "the more specific interest in making decisions about

Fourteenth Amendment. *Cruzan,* 497 U. S., at 278–279; *id.,* at 287–288 (O'CONNOR, J., concurring). True, the Court relied on Justice Harlan's dissent in *Casey,* 505 U. S., at 848–850, but, as *Flores* demonstrates, we did not in so doing jettison our established approach. Indeed, to read such a radical move into the Court's opinion in *Casey* would seem to fly in the face of that opinion's emphasis on *stare decisis.* 505 U. S., at 854–869.

how to confront an imminent death"), we were, in fact, more precise: We assumed that the Constitution granted competent persons a "constitutionally protected right to refuse life-saving hydration and nutrition." *Cruzan*, 497 U. S., at 279; *id.*, at 287 (O'CONNOR, J., concurring) ("[A] liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"). The Washington statute at issue in this case prohibits "aid[ing] another person to attempt suicide," Wash. Rev. Code § 9A.36.060(1) (1994), and, thus, the question before us is whether the "liberty" specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so.[18]

We now inquire whether this asserted right has any place in our Nation's traditions. Here, as discussed *supra*, at 710–719, we are confronted with a consistent and almost universal tradition that has long rejected the asserted right, and continues explicitly to reject it today, even for terminally ill, mentally competent adults. To hold for respondents, we would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State. See *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922) ("If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it"); *Flores*, 507 U. S., at 303 ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it").

Respondents contend, however, that the liberty interest they assert *is* consistent with this Court's substantive-due-

[18] See, *e. g.*, *Quill* v. *Vacco*, 80 F. 3d 716, 724 (CA2 1996) ("right to assisted suicide finds no cognizable basis in the Constitution's language or design"); *Compassion in Dying* v. *Washington*, 49 F. 3d 586, 591 (CA9 1995) (referring to alleged "right to suicide," "right to assistance in suicide," and "right to aid in killing oneself"); *People* v. *Kevorkian*, 447 Mich. 436, 476, n. 47, 527 N. W. 2d 714, 730, n. 47 (1994) ("[T]he question that we must decide is whether the [C]onstitution encompasses a right to commit suicide and, if so, whether it includes a right to assistance").

process line of cases, if not with this Nation's history and practice. Pointing to *Casey* and *Cruzan*, respondents read our jurisprudence in this area as reflecting a general tradition of "self-sovereignty," Brief for Respondents 12, and as teaching that the "liberty" protected by the Due Process Clause includes "basic and intimate exercises of personal autonomy," *id.*, at 10; see *Casey*, 505 U. S., at 847 ("It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter"). According to respondents, our liberty jurisprudence, and the broad, individualistic principles it reflects, protects the "liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference." Brief for Respondents 10. The question presented in this case, however, is whether the protections of the Due Process Clause include a right to commit suicide with another's assistance. With this "careful description" of respondents' claim in mind, we turn to *Casey* and *Cruzan*.

In *Cruzan*, we considered whether Nancy Beth Cruzan, who had been severely injured in an automobile accident and was in a persistive vegetative state, "ha[d] a right under the United States Constitution which would require the hospital to withdraw life-sustaining treatment" at her parents' request. 497 U. S., at 269. We began with the observation that "[a]t common law, even the touching of one person by another without consent and without legal justification was a battery." *Ibid.* We then discussed the related rule that "informed consent is generally required for medical treatment." *Ibid.* After reviewing a long line of relevant state cases, we concluded that "the common-law doctrine of informed consent is viewed as generally encompassing the right of a competent individual to refuse medical treatment." *Id.*, at 277. Next, we reviewed our own cases on the subject, and stated that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior

decisions." *Id.*, at 278. Therefore, "for purposes of [that] case, we assume[d] that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.*, at 279; see *id.*, at 287 (O'CONNOR, J., concurring). We concluded that, notwithstanding this right, the Constitution permitted Missouri to require clear and convincing evidence of an incompetent patient's wishes concerning the withdrawal of life-sustaining treatment. *Id.*, at 280–281.

Respondents contend that in *Cruzan* we "acknowledged that competent, dying persons have the right to direct the removal of life-sustaining medical treatment and thus hasten death," Brief for Respondents 23, and that "the constitutional principle behind recognizing the patient's liberty to direct the withdrawal of artificial life support applies at least as strongly to the choice to hasten impending death by consuming lethal medication," *id.*, at 26. Similarly, the Court of Appeals concluded that "*Cruzan*, by recognizing a liberty interest that includes the refusal of artificial provision of life-sustaining food and water, necessarily recognize[d] a liberty interest in hastening one's own death." 79 F. 3d, at 816.

The right assumed in *Cruzan*, however, was not simply deduced from abstract concepts of personal autonomy. Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions. The decision to commit suicide with the assistance of another may be just as personal and profound as the decision to refuse unwanted medical treatment, but it has never enjoyed similar legal protection. Indeed, the two acts are widely and reasonably regarded as quite distinct. See *Quill* v. *Vacco*, *post*, at 800–808. In *Cruzan* itself, we recognized that most States outlawed assisted suicide—and even more do today—and we certainly gave no intimation that the right to refuse unwanted medical treatment could be some-

how transmuted into a right to assistance in committing suicide.   497 U. S., at 280.

Respondents also rely on *Casey*.   There, the Court's opinion concluded that "the essential holding of *Roe* v. *Wade*[, 410 U. S. 113 (1973),] should be retained and once again reaffirmed."   505 U. S., at 846.   We held, first, that a woman has a right, before her fetus is viable, to an abortion "without undue interference from the State"; second, that States may restrict postviability abortions, so long as exceptions are made to protect a woman's life and health; and third, that the State has legitimate interests throughout a pregnancy in protecting the health of the woman and the life of the unborn child.   *Ibid.*   In reaching this conclusion, the opinion discussed in some detail this Court's substantive-due-process tradition of interpreting the Due Process Clause to protect certain fundamental rights and "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education," and noted that many of those rights and liberties "involv[e] the most intimate and personal choices a person may make in a lifetime."   *Id.*, at 851.

The Court of Appeals, like the District Court, found *Casey* " 'highly instructive' " and " 'almost prescriptive' " for determining " 'what liberty interest may inhere in a terminally ill person's choice to commit suicide' ":

> "Like the decision of whether or not to have an abortion, the decision how and when to die is one of 'the most intimate and personal choices a person may make in a lifetime,' a choice 'central to personal dignity and autonomy.' "   79 F. 3d, at 813–814.

Similarly, respondents emphasize the statement in *Casey* that:

> "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.   Beliefs about these matters could not define the attributes of personhood were they

formed under compulsion of the State." 505 U. S., at 851.

Brief for Respondents 12. By choosing this language, the Court's opinion in *Casey* described, in a general way and in light of our prior cases, those personal activities and decisions that this Court has identified as so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected by the Fourteenth Amendment.[19] The opinion moved from the recognition that liberty necessarily includes freedom of conscience and belief about ultimate considerations to the observation that "though the abortion decision may originate within the zone of conscience and belief, it is *more than a philosophic exercise.*" *Casey,* 505 U. S., at 852 (emphasis added). That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected, *San An-*

---

[19] See *Moore* v. *East Cleveland,* 431 U. S. 494, 503 (1977) ("[T]he Constitution protects the sanctity of the family *precisely because* the institution of the family is deeply rooted in this Nation's history and tradition" (emphasis added)); *Griswold* v. *Connecticut,* 381 U. S. 479, 485–486 (1965) (intrusions into the "sacred precincts of marital bedrooms" offend rights "older than the Bill of Rights"); *id.,* at 495–496 (Goldberg, J., concurring) (the law in question "disrupt[ed] the traditional relation of the family—a relation as old and as fundamental as our entire civilization"); *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness"); *Turner* v. *Safley,* 482 U. S. 78, 95 (1987) ("[T]he decision to marry is a fundamental right"); *Roe* v. *Wade,* 410 U. S. 113, 140 (1973) (stating that at the founding and throughout the 19th century, "a woman enjoyed a substantially broader right to terminate a pregnancy"); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942) ("Marriage and procreation are fundamental"); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925); *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923) (liberty includes "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men").

*tonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 33–35 (1973), and *Casey* did not suggest otherwise.

The history of the law's treatment of assisted suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it. That being the case, our decisions lead us to conclude that the asserted "right" to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause. The Constitution also requires, however, that Washington's assisted-suicide ban be rationally related to legitimate government interests. See *Heller* v. *Doe*, 509 U. S. 312, 319–320 (1993); *Flores*, 507 U. S., at 305. This requirement is unquestionably met here. As the court below recognized, 79 F. 3d, at 816–817,[20] Washington's assisted-suicide ban implicates a number of state interests.[21] See 49 F. 3d, at 592–593; Brief for State of California et al. as *Amici Curiae* 26–29; Brief for United States as *Amicus Curiae* 16–27.

First, Washington has an "unqualified interest in the preservation of human life." *Cruzan*, 497 U. S., at 282. The State's prohibition on assisted suicide, like all homicide laws, both reflects and advances its commitment to this interest. See *id.*, at 280; Model Penal Code § 210.5, Comment 5, at 100 ("[T]he interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of

---

[20] The court identified and discussed six state interests: (1) preserving life; (2) preventing suicide; (3) avoiding the involvement of third parties and use of arbitrary, unfair, or undue influence; (4) protecting family members and loved ones; (5) protecting the integrity of the medical profession; and (6) avoiding future movement toward euthanasia and other abuses. 79 F. 3d, at 816–832.

[21] Respondents also admit the existence of these interests, Brief for Respondents 28–39, but contend that Washington could better promote and protect them through regulation, rather than prohibition, of physician-assisted suicide. Our inquiry, however, is limited to the question whether the State's prohibition is rationally related to legitimate state interests.

another").[22]   This interest is symbolic and aspirational as well as practical:

> "While suicide is no longer prohibited or penalized, the ban against assisted suicide and euthanasia shores up the notion of limits in human relationships.   It reflects the gravity with which we view the decision to take one's own life or the life of another, and our reluctance to encourage or promote these decisions."   New York Task Force 131–132.

Respondents admit that "[t]he State has a real interest in preserving the lives of those who can still contribute to society and have the potential to enjoy life."   Brief for Respondents 35, n. 23.   The Court of Appeals also recognized Washington's interest in protecting life, but held that the "weight" of this interest depends on the "medical condition and the wishes of the person whose life is at stake."   79 F. 3d, at 817.   Washington, however, has rejected this sliding-scale approach and, through its assisted-suicide ban, insists that all persons' lives, from beginning to end, regardless of physical or mental condition, are under the full protection of the law.   See *United States* v. *Rutherford*, 442 U. S. 544, 558 (1979) (". . . Congress could reasonably have determined to protect the terminally ill, no less than other patients, from the vast range of self-styled panaceas that inventive minds can devise").   As we have previously affirmed, the States "may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy," *Cruzan*,

---

[22] The States express this commitment by other means as well:

"[N]early all states expressly disapprove of suicide and assisted suicide either in statutes dealing with durable powers of attorney in health-care situations, or in 'living will' statutes.   In addition, all states provide for the involuntary commitment of persons who may harm themselves as the result of mental illness, and a number of states allow the use of nondeadly force to thwart suicide attempts." *People* v. *Kevorkian*, 447 Mich., at 478–479, and nn. 53–56, 527 N. W. 2d, at 731–732, and nn. 53–56.

*supra,* at 282. This remains true, as *Cruzan* makes clear, even for those who are near death.

Relatedly, all admit that suicide is a serious public-health problem, especially among persons in otherwise vulnerable groups. See Washington State Dept. of Health, Annual Summary of Vital Statistics 1991, pp. 29–30 (Oct. 1992) (suicide is a leading cause of death in Washington of those between the ages of 14 and 54); New York Task Force 10, 23–33 (suicide rate in the general population is about one percent, and suicide is especially prevalent among the young and the elderly). The State has an interest in preventing suicide, and in studying, identifying, and treating its causes. See 79 F. 3d, at 820; *id.,* at 854 (Beezer, J., dissenting) ("The state recognizes suicide as a manifestation of medical and psychological anguish"); Marzen 107–146.

Those who attempt suicide—terminally ill or not—often suffer from depression or other mental disorders. See New York Task Force 13–22, 126–128 (more than 95% of those who commit suicide had a major psychiatric illness at the time of death; among the terminally ill, uncontrolled pain is a "risk factor" because it contributes to depression); Physician-Assisted Suicide and Euthanasia in the Netherlands: A Report of Chairman Charles T. Canady to the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess., 10–11 (Comm. Print 1996); cf. Back, Wallace, Starks, & Pearlman, Physician-Assisted Suicide and Euthanasia in Washington State, 275 JAMA 919, 924 (1996) ("[I]ntolerable physical symptoms are not the reason most patients request physician-assisted suicide or euthanasia"). Research indicates, however, that many people who request physician-assisted suicide withdraw that request if their depression and pain are treated. H. Hendin, Seduced by Death: Doctors, Patients and the Dutch Cure 24–25 (1997) (suicidal, terminally ill patients "usually respond well to treatment for depressive illness and pain medication and are then grateful to be alive"); New York Task Force 177–178.

The New York Task Force, however, expressed its concern that, because depression is difficult to diagnose, physicians and medical professionals often fail to respond adequately to seriously ill patients' needs. *Id.*, at 175. Thus, legal physician-assisted suicide could make it more difficult for the State to protect depressed or mentally ill persons, or those who are suffering from untreated pain, from suicidal impulses.

The State also has an interest in protecting the integrity and ethics of the medical profession. In contrast to the Court of Appeals' conclusion that "the integrity of the medical profession would [not] be threatened in any way by [physician-assisted suicide]," 79 F. 3d, at 827, the American Medical Association, like many other medical and physicians' groups, has concluded that "[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer." American Medical Association, Code of Ethics § 2.211 (1994); see Council on Ethical and Judicial Affairs, Decisions Near the End of Life, 267 JAMA 2229, 2233 (1992) ("[T]he societal risks of involving physicians in medical interventions to cause patients' deaths is too great"); New York Task Force 103–109 (discussing physicians' views). And physician-assisted suicide could, it is argued, undermine the trust that is essential to the doctor-patient relationship by blurring the time-honored line between healing and harming. Assisted Suicide in the United States, Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 104th Cong., 2d Sess., 355–356 (1996) (testimony of Dr. Leon R. Kass) ("The patient's trust in the doctor's whole-hearted devotion to his best interests will be hard to sustain").

Next, the State has an interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes. The Court of Appeals dismissed the State's concern that disadvantaged persons might be pressured into physician-assisted suicide as

"ludicrous on its face." 79 F. 3d, at 825. We have recognized, however, the real risk of subtle coercion and undue influence in end-of-life situations. *Cruzan*, 497 U. S., at 281. Similarly, the New York Task Force warned that "[l]egalizing physician-assisted suicide would pose profound risks to many individuals who are ill and vulnerable. . . . The risk of harm is greatest for the many individuals in our society whose autonomy and well-being are already compromised by poverty, lack of access to good medical care, advanced age, or membership in a stigmatized social group." New York Task Force 120; see *Compassion in Dying*, 49 F. 3d, at 593 ("An insidious bias against the handicapped—again coupled with a cost-saving mentality—makes them especially in need of Washington's statutory protection"). If physician-assisted suicide were permitted, many might resort to it to spare their families the substantial financial burden of end-of-life health-care costs.

The State's interest here goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and "societal indifference." 49 F. 3d, at 592. The State's assisted-suicide ban reflects and reinforces its policy that the lives of terminally ill, disabled, and elderly people must be no less valued than the lives of the young and healthy, and that a seriously disabled person's suicidal impulses should be interpreted and treated the same way as anyone else's. See New York Task Force 101–102; Physician-Assisted Suicide and Euthanasia in the Netherlands: A Report of Chairman Charles T. Canady, *supra*, at 9, 20 (discussing prejudice toward the disabled and the negative messages euthanasia and assisted suicide send to handicapped patients).

Finally, the State may fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia. The Court of Appeals struck down

Washington's assisted-suicide ban only "as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors." 79 F. 3d, at 838. Washington insists, however, that the impact of the court's decision will not and cannot be so limited. Brief for Petitioners 44–47. If suicide is protected as a matter of constitutional right, it is argued, "every man and woman in the United States must enjoy it." *Compassion in Dying*, 49 F. 3d, at 591; see *Kevorkian*, 447 Mich., at 470, n. 41, 527 N. W. 2d, at 727–728, n. 41. The Court of Appeals' decision, and its expansive reasoning, provide ample support for the State's concerns. The court noted, for example, that the "decision of a duly appointed surrogate decision maker is for all legal purposes the decision of the patient himself," 79 F. 3d, at 832, n. 120; that "in some instances, the patient may be unable to self-administer the drugs and . . . administration by the physician . . . may be the only way the patient may be able to receive them," *id.*, at 831; and that not only physicians, but also family members and loved ones, will inevitably participate in assisting suicide, *id.*, at 838, n. 140. Thus, it turns out that what is couched as a limited right to "physician-assisted suicide" is likely, in effect, a much broader license, which could prove extremely difficult to police and contain.[23] Washington's ban on assisting suicide prevents such erosion.

---

[23] JUSTICE SOUTER concludes that "[t]he case for the slippery slope is fairly made out here, not because recognizing one due process right would leave a court with no principled basis to avoid recognizing another, but because there is a plausible case that the right claimed would not be readily containable by reference to facts about the mind that are matters of difficult judgment, or by gatekeepers who are subject to temptation, noble or not." *Post*, at 785 (opinion concurring in judgment). We agree that the case for a slippery slope has been made out, but—bearing in mind Justice Cardozo's observation of "[t]he tendency of a principle to expand itself to the limit of its logic," The Nature of the Judicial Process 51 (1932)—we also recognize the reasonableness of the widely expressed

This concern is further supported by evidence about the practice of euthanasia in the Netherlands. The Dutch government's own study revealed that in 1990, there were 2,300 cases of voluntary euthanasia (defined as "the deliberate termination of another's life at his request"), 400 cases of assisted suicide, and more than 1,000 cases of euthanasia without an explicit request. In addition to these latter 1,000 cases, the study found an additional 4,941 cases where physicians administered lethal morphine overdoses without the patients' explicit consent. Physician-Assisted Suicide and Euthanasia in the Netherlands: A Report of Chairman Charles T. Canady, *supra*, 12–13 (citing Dutch study). This study suggests that, despite the existence of various reporting procedures, euthanasia in the Netherlands has not been limited to competent, terminally ill adults who are enduring physical suffering, and that regulation of the practice may not have prevented abuses in cases involving vulnerable persons, including severely disabled neonates and elderly persons suffering from dementia. *Id.*, at 16–21; see generally C. Gomez, Regulating Death: Euthanasia and the Case of the Netherlands (1991); H. Hendin, Seduced By Death: Doctors, Patients, and the Dutch Cure (1997). The New York Task Force, citing the Dutch experience, observed that "assisted suicide and euthanasia are closely linked," New York Task Force 145, and concluded that the "risk of . . . abuse is neither speculative nor distant," *id.*, at 134. Washington, like most

---

skepticism about the lack of a principled basis for confining the right. See Brief for United States as *Amicus Curiae* 26 ("Once a legislature abandons a categorical prohibition against physician assisted suicide, there is no obvious stopping point"); Brief for Not Dead Yet et al. as *Amici Curiae* 21–29; Brief for Bioethics Professors as *Amici Curiae* 23–26; Report of the Council on Ethical and Judicial Affairs, App. 133, 140 ("[I]f assisted suicide is permitted, then there is a strong argument for allowing euthanasia"); New York Task Force 132; Kamisar, The "Right to Die": On Drawing (and Erasing) Lines, 35 Duquesne L. Rev. 481 (1996); Kamisar, Against Assisted Suicide—Even in a Very Limited Form, 72 U. Det. Mercy L. Rev. 735 (1995).

other States, reasonably ensures against this risk by banning, rather than regulating, assisted suicide. See *United States* v. *12 200-ft. Reels of Super 8MM. Film*, 413 U. S. 123, 127 (1973) ("Each step, when taken, appear[s] a reasonable step in relation to that which preceded it, although the aggregate or end result is one that would never have been seriously considered in the first instance").

We need not weigh exactingly the relative strengths of these various interests. They are unquestionably important and legitimate, and Washington's ban on assisted suicide is at least reasonably related to their promotion and protection. We therefore hold that Wash. Rev. Code § 9A.36.060(1) (1994) does not violate the Fourteenth Amendment, either on its face or "as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors." 79 F. 3d, at 838.[24]

\* \* \*

Throughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide. Our holding permits this debate to continue, as it should in a democratic society. The decision of the en banc Court of Appeals is

---

[24] JUSTICE STEVENS states that "the Court does conceive of respondents' claim as a facial challenge—addressing not the application of the statute to a particular set of plaintiffs before it, but the constitutionality of the statute's categorical prohibition . . . ." *Post*, at 740 (opinion concurring in judgments). We emphasize that we today reject the Court of Appeals' specific holding that the statute is unconstitutional "as applied" to a particular class. See n. 6, *supra*. JUSTICE STEVENS agrees with this holding, see *post*, at 750, but would not "foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge," *ibid*. Our opinion does not absolutely foreclose such a claim. However, given our holding that the Due Process Clause of the Fourteenth Amendment does not provide heightened protection to the asserted liberty interest in ending one's life with a physician's assistance, such a claim would have to be quite different from the ones advanced by respondents here.

reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.* †

Death will be different for each of us. For many, the last days will be spent in physical pain and perhaps the despair that accompanies physical deterioration and a loss of control of basic bodily and mental functions. Some will seek medication to alleviate that pain and other symptoms.

The Court frames the issue in *Washington* v. *Glucksberg* as whether the Due Process Clause of the Constitution protects a "right to commit suicide which itself includes a right to assistance in doing so," *ante*, at 723, and concludes that our Nation's history, legal traditions, and practices do not support the existence of such a right. I join the Court's opinions because I agree that there is no generalized right to "commit suicide." But respondents urge us to address the narrower question whether a mentally competent person who is experiencing great suffering has a constitutionally cognizable interest in controlling the circumstances of his or her imminent death. I see no need to reach that question in the context of the facial challenges to the New York and Washington laws at issue here. See *ibid.* ("The Washington statute at issue in this case prohibits 'aid[ing] another person to attempt suicide,'. . . and, thus, the question before us is whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so"). The parties and *amici* agree that in these States a patient who is

---

*JUSTICE GINSBURG concurs in the Court's judgments substantially for the reasons stated in this opinion. JUSTICE BREYER joins this opinion except insofar as it joins the opinions of the Court.

†[This opinion applies also to No. 95–1858, *Vacco et al.* v. *Quill et al., post*, p. 793.]

suffering from a terminal illness and who is experiencing great pain has no legal barriers to obtaining medication, from qualified physicians, to alleviate that suffering, even to the point of causing unconsciousness and hastening death. See Wash. Rev. Code § 70.122.010 (1994); Brief for Petitioners in No. 95–1858, p. 15, n. 9; Brief for Respondents in No. 95–1858, p. 15. In this light, even assuming that we would recognize such an interest, I agree that the State's interests in protecting those who are not truly competent or facing imminent death, or those whose decisions to hasten death would not truly be voluntary, are sufficiently weighty to justify a prohibition against physician-assisted suicide. *Ante,* at 731–733; *post,* at 747 (STEVENS, J., concurring in judgments); *post,* at 782–787 (SOUTER, J., concurring in judgment).

Every one of us at some point may be affected by our own or a family member's terminal illness. There is no reason to think the democratic process will not strike the proper balance between the interests of terminally ill, mentally competent individuals who would seek to end their suffering and the State's interests in protecting those who might seek to end life mistakenly or under pressure. As the Court recognizes, States are presently undertaking extensive and serious evaluation of physician-assisted suicide and other related issues. *Ante,* at 716–718; see *post,* at 785–788 (SOUTER, J., concurring in judgment). In such circumstances, "the . . . challenging task of crafting appropriate procedures for safeguarding . . . liberty interests is entrusted to the 'laboratory' of the States . . . in the first instance." *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 292 (1990) (O'CONNOR, J., concurring) (citing *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932)).

In sum, there is no need to address the question whether suffering patients have a constitutionally cognizable interest in obtaining relief from the suffering that they may experience in the last days of their lives. There is no dispute that

738

dying patients in Washington and New York can obtain palliative care, even when doing so would hasten their deaths. The difficulty in defining terminal illness and the risk that a dying patient's request for assistance in ending his or her life might not be truly voluntary justifies the prohibitions on assisted suicide we uphold here.

JUSTICE STEVENS, concurring in the judgments.*

The Court ends its opinion with the important observation that our holding today is fully consistent with a continuation of the vigorous debate about the "morality, legality, and practicality of physician-assisted suicide" in a democratic society. *Ante,* at 735. I write separately to make it clear that there is also room for further debate about the limits that the Constitution places on the power of the States to punish the practice.

I

The morality, legality, and practicality of capital punishment have been the subject of debate for many years. In 1976, this Court upheld the constitutionality of the practice in cases coming to us from Georgia,[1] Florida,[2] and Texas.[3] In those cases we concluded that a State does have the power to place a lesser value on some lives than on others; there is no absolute requirement that a State treat all human life as having an equal right to preservation. Because the state legislatures had sufficiently narrowed the category of lives that the State could terminate, and had enacted special procedures to ensure that the defendant belonged in that limited category, we concluded that the statutes were not unconstitutional on their face. In later cases coming to us from each

---

*[This opinion applies also to No. 95–1858, *Vacco et al.* v. *Quill et al., post,* p. 793.]

[1] *Gregg* v. *Georgia,* 428 U. S. 153 (1976).

[2] *Proffitt* v. *Florida,* 428 U. S. 242 (1976).

[3] *Jurek* v. *Texas,* 428 U. S. 262 (1976).

of those States, however, we found that some applications of the statutes were unconstitutional.[4]

Today, the Court decides that Washington's statute prohibiting assisted suicide is not invalid "on its face," that is to say, in all or most cases in which it might be applied.[5]  That holding, however, does not foreclose the possibility that some applications of the statute might well be invalid.

As originally filed, *Washington* v. *Glucksberg* presented a challenge to the Washington statute on its face and as it applied to three terminally ill, mentally competent patients and to four physicians who treat terminally ill patients.  After the District Court issued its opinion holding that the statute placed an undue burden on the right to commit physician-assisted suicide, see *Compassion in Dying* v. *Washington*, 850 F. Supp. 1454, 1462, 1465 (WD Wash. 1994), the three patients died.  Although the Court of Appeals considered the constitutionality of the statute "as applied to the prescription of life-ending medication for use by terminally ill, competent adult patients who wish to hasten their deaths," *Compassion in Dying* v. *Washington*, 79 F. 3d 790, 798 (CA9 1996), the court did not have before it any individual plaintiff seeking to hasten her death or any doctor who was threatened with prosecution for assisting in the suicide of a particular patient; its analysis and eventual holding that the statute was unconstitutional was not limited to a particular set of plaintiffs before it.

The appropriate standard to be applied in cases making facial challenges to state statutes has been the subject of debate within this Court.  See *Janklow* v. *Planned Parenthood, Sioux Falls Clinic*, 517 U. S. 1174 (1996).  Upholding the validity of the federal Bail Reform Act of 1984, the Court stated in *United States* v. *Salerno*, 481 U. S. 739 (1987), that a "facial challenge to a legislative Act is, of course, the most

---

[4] See, *e. g., Godfrey* v. *Georgia*, 446 U. S. 420 (1980); *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Penry* v. *Lynaugh*, 492 U. S. 302 (1989).

[5] See *ante*, at 709, n. 6.

difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.*, at 745.[6] I do not believe the Court has ever actually applied such a strict standard,[7] even in *Salerno* itself, and the Court does not appear to apply *Salerno* here. Nevertheless, the Court does conceive of respondents' claim as a facial challenge—addressing not the application of the statute to a particular set of plaintiffs before it, but the constitutionality of the statute's categorical prohibition against "aid[ing] another person to attempt suicide." *Ante,* at 723 (internal quotation marks omitted) (citing Wash. Rev. Code § 9A.36.060(1) (1994)). Accordingly, the Court requires the plaintiffs to show that the interest in liberty protected by the Fourteenth Amendment "includes a right to commit suicide which itself includes a right to assistance in doing so." *Ante,* at 723.

History and tradition provide ample support for refusing to recognize an open-ended constitutional right to commit suicide. Much more than the State's paternalistic interest

---

[6] If the Court had actually applied the *Salerno* standard in this action, it would have taken only a few paragraphs to identify situations in which the Washington statute could be validly enforced. In *Salerno* itself, the Court would have needed only to look at whether the statute could be constitutionally applied to the arrestees before it; any further analysis would have been superfluous. See Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 239–240 (1994) (arguing that if the *Salerno* standard were taken literally, a litigant could not succeed in her facial challenge unless she also succeeded in her as applied challenge).

[7] In other cases and in other contexts, we have imposed a significantly lesser burden on the challenger. The most lenient standard that we have applied requires the challenger to establish that the invalid applications of a statute "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 615 (1973). As the Court's opinion demonstrates, Washington's statute prohibiting assisted suicide has a "plainly legitimate sweep." While that demonstration provides a sufficient justification for rejecting respondents' facial challenge, it does not mean that every application of the statute should or will be upheld.

in protecting the individual from the irrevocable conse-
quences of an ill-advised decision motivated by temporary
concerns is at stake. There is truth in John Donne's obser-
vation that "No man is an island."[8] The State has an inter-
est in preserving and fostering the benefits that every
human being may provide to the community—a community
that thrives on the exchange of ideas, expressions of af-
fection, shared memories, and humorous incidents, as well as
on the material contributions that its members create and
support. The value to others of a person's life is far too
precious to allow the individual to claim a constitutional enti-
tlement to complete autonomy in making a decision to end
that life. Thus, I fully agree with the Court that the "lib-
erty" protected by the Due Process Clause does not include
a categorical "right to commit suicide which itself includes a
right to assistance in doing so." *Ibid.*

But just as our conclusion that capital punishment is not
always unconstitutional did not preclude later decisions hold-
ing that it is sometimes impermissibly cruel, so is it equally
clear that a decision upholding a general statutory prohibi-
tion of assisted suicide does not mean that every possible
application of the statute would be valid. A State, like
Washington, that has authorized the death penalty, and
thereby has concluded that the sanctity of human life does
not require that it always be preserved, must acknowledge
that there are situations in which an interest in hastening

---

[8] "Who casts not up his eye to the sun when it rises? but who takes off
his eye from a comet when that breaks out? Who bends not his ear to
any bell which upon any occasion rings? but who can remove it from that
bell which is passing a piece of himself out of this world? No man is an
island, entire of itself; every man is a piece of the continent, a part of the
main. If a clod be washed away by the sea, Europe is the less, as well as
if a promontory were, as well as if a manor of thy friend's or of thine own
were; any man's death diminishes me, because I am involved in mankind;
and therefore never send to know for whom the bell tolls; it tolls for thee."
J. Donne, Meditation No. 17, Devotions Upon Emergent Occasions (1623)
(http://www.kfu.com/~pl...om_the_bell_tolls.html).

death is legitimate. Indeed, not only is that interest some-
times legitimate, I am also convinced that there are times
when it is entitled to constitutional protection.

## II

In *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261
(1990), the Court assumed that the interest in liberty pro-
tected by the Fourteenth Amendment encompassed the right
of a terminally ill patient to direct the withdrawal of life-
sustaining treatment. As the Court correctly observes
today, that assumption "was not simply deduced from
abstract concepts of personal autonomy." *Ante*, at 725. In-
stead, it was supported by the common-law tradition protect-
ing the individual's general right to refuse unwanted medical
treatment. *Ibid.* We have recognized, however, that this
common-law right to refuse treatment is neither absolute nor
always sufficiently weighty to overcome valid countervailing
state interests. As Justice Brennan pointed out in his *Cru-
zan* dissent, we have upheld legislation imposing punishment
on persons refusing to be vaccinated, 497 U. S., at 312, n. 12,
citing *Jacobson* v. *Massachusetts*, 197 U. S. 11, 26–27 (1905),
and as JUSTICE SCALIA pointed out in his concurrence, the
State ordinarily has the right to interfere with an attempt
to commit suicide by, for example, forcibly placing a bandage
on a self-inflicted wound to stop the flow of blood. 497 U. S.,
at 298. In most cases, the individual's constitutionally pro-
tected interest in his or her own physical autonomy, includ-
ing the right to refuse unwanted medical treatment, will give
way to the State's interest in preserving human life.

*Cruzan*, however, was not the normal case. Given the ir-
reversible nature of her illness and the progressive character
of her suffering,[9] Nancy Cruzan's interest in refusing medical
care was incidental to her more basic interest in controlling
the manner and timing of her death. In finding that her

---

[9] See 497 U. S., at 332, n. 2.

best interests would be served by cutting off the nourish-
ment that kept her alive, the trial court did more than simply
vindicate Cruzan's interest in refusing medical treatment;
the court, in essence, authorized affirmative conduct that
would hasten her death. When this Court reviewed the
case and upheld Missouri's requirement that there be clear
and convincing evidence establishing Nancy Cruzan's intent
to have life-sustaining nourishment withdrawn, it made two
important assumptions: (1) that there was a "liberty inter-
est" in refusing unwanted treatment protected by the Due
Process Clause; and (2) that this liberty interest did not "end
the inquiry" because it might be outweighed by relevant
state interests. *Id.*, at 279. I agree with both of those as-
sumptions, but I insist that the source of Nancy Cruzan's
right to refuse treatment was not just a common-law rule.
Rather, this right is an aspect of a far broader and more
basic concept of freedom that is even older than the common
law.[10] This freedom embraces not merely a person's right
to refuse a particular kind of unwanted treatment, but also
her interest in dignity, and in determining the character of
the memories that will survive long after her death.[11] In

---

[10] "[N]either the Bill of Rights nor the laws of sovereign States create
the liberty which the Due Process Clause protects. The relevant consti-
tutional provisions are limitations on the power of the sovereign to in-
fringe on the liberty of the citizen. The relevant state laws either create
property rights, or they curtail the freedom of the citizen who must live
in an ordered society. Of course, law is essential to the exercise and en-
joyment of individual liberty in a complex society. But it is not the source
of liberty, and surely not the exclusive source.

"I had thought it self-evident that all men were endowed by their Cre-
ator with liberty as one of the cardinal unalienable rights. It is that basic
freedom which the Due Process Clause protects, rather than the particular
rights or privileges conferred by specific laws or regulations." *Meachum
v. Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting).

[11] "Nancy Cruzan's interest in life, no less than that of any other person,
includes an interest in how she will be thought of after her death by those
whose opinions mattered to her. There can be no doubt that her life made
her dear to her family and to others. How she dies will affect how that

recognizing that the State's interests did not outweigh Nancy Cruzan's liberty interest in refusing medical treatment, *Cruzan* rested not simply on the common-law right to refuse medical treatment, but—at least implicitly—on the even more fundamental right to make this "deeply personal decision," *id.*, at 289 (O'CONNOR, J., concurring).

Thus, the common-law right to protection from battery, which included the right to refuse medical treatment in most circumstances, did not mark "the outer limits of the substantive sphere of liberty" that supported the Cruzan family's decision to hasten Nancy's death. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 848 (1992). Those limits have never been precisely defined. They are generally identified by the importance and character of the decision confronted by the individual, *Whalen* v. *Roe*, 429 U. S. 589, 599–600, n. 26 (1977). Whatever the outer limits of the concept may be, it definitely includes protection for matters "central to personal dignity and autonomy." *Casey*, 505 U. S., at 851. It includes

> "the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny. The Court has referred to such decisions as implicating 'basic values,' as being 'fundamental,' and as being dignified by history and tradition. The character of the Court's language in these cases brings to mind the origins of the American heritage of freedom—the

life is remembered." *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 344 (1990) (STEVENS, J., dissenting).

"Each of us has an interest in the kind of memories that will survive after death. To that end, individual decisions are often motivated by their impact on others. A member of the kind of family identified in the trial court's findings in this case would likely have not only a normal interest in minimizing the burden that her own illness imposes on others, but also an interest in having their memories of her filled predominantly with thoughts about her past vitality rather than her current condition." *Id.*, at 356.

abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable." *Fitzgerald* v. *Porter Memorial Hospital,* 523 F. 2d 716, 719–720 (CA7 1975) (footnotes omitted), cert. denied, 425 U. S. 916 (1976).

The *Cruzan* case demonstrated that some state intrusions on the right to decide how death will be encountered are also intolerable. The now-deceased plaintiffs in this action may in fact have had a liberty interest even stronger than Nancy Cruzan's because, not only were they terminally ill, they were suffering constant and severe pain. Avoiding intolerable pain and the indignity of living one's final days incapacitated and in agony is certainly "[a]t the heart of [the] liberty . . . to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey,* 505 U. S., at 851.

While I agree with the Court that *Cruzan* does not decide the issue presented by these cases, *Cruzan* did give recognition, not just to vague, unbridled notions of autonomy, but to the more specific interest in making decisions about how to confront an imminent death. Although there is no absolute right to physician-assisted suicide, *Cruzan* makes it clear that some individuals who no longer have the option of deciding whether to live or to die because they are already on the threshold of death have a constitutionally protected interest that may outweigh the State's interest in preserving life at all costs. The liberty interest at stake in a case like this differs from, and is stronger than, both the common-law right to refuse medical treatment and the unbridled interest in deciding whether to live or die. It is an interest in deciding how, rather than whether, a critical threshold shall be crossed.

### III

The state interests supporting a general rule banning the practice of physician-assisted suicide do not have the same

force in all cases. First and foremost of these interests is the " 'unqualified interest in the preservation of human life,' " *ante,* at 728 (quoting *Cruzan,* 497 U. S., at 282), which is equated with " 'the sanctity of life,' " *ante,* at 728 (quoting American Law Institute, Model Penal Code § 210.5, Comment 5, p. 100 (Official Draft and Revised Comments 1980)). That interest not only justifies—it commands—maximum protection of every individual's interest in remaining alive, which in turn commands the same protection for decisions about whether to commence or to terminate life-support systems or to administer pain medication that may hasten death. Properly viewed, however, this interest is not a collective interest that should always outweigh the interests of a person who because of pain, incapacity, or sedation finds her life intolerable, but rather, an aspect of individual freedom.

Many terminally ill people find their lives meaningful even if filled with pain or dependence on others. Some find value in living through suffering; some have an abiding desire to witness particular events in their families' lives; many believe it a sin to hasten death. Individuals of different religious faiths make different judgments and choices about whether to live on under such circumstances. There are those who will want to continue aggressive treatment; those who would prefer terminal sedation; and those who will seek withdrawal from life-support systems and death by gradual starvation and dehydration. Although as a general matter the State's interest in the contributions each person may make to society outweighs the person's interest in ending her life, this interest does not have the same force for a terminally ill patient faced not with the choice of whether to live, only of how to die. Allowing the individual, rather than the State, to make judgments " 'about the "quality" of life that a particular individual may enjoy,' " *ante,* at 729 (quoting *Cruzan,* 497 U. S., at 282), does not mean that the lives of terminally ill, disabled people have less value than the lives of those who are healthy, see *ante,* at 732. Rather, it gives

proper recognition to the individual's interest in choosing a final chapter that accords with her life story, rather than one that demeans her values and poisons memories of her. See Brief for Bioethicists as *Amici Curiae* 11; see also R. Dworkin, Life's Dominion 213 (1993) ("Whether it is in someone's best interests that his life end in one way rather than another depends on so much else that is special about him— about the shape and character of his life and his own sense of his integrity and critical interests—that no uniform collective decision can possibly hope to serve everyone even decently").

Similarly, the State's legitimate interests in preventing suicide, protecting the vulnerable from coercion and abuse, and preventing euthanasia are less significant in this context. I agree that the State has a compelling interest in preventing persons from committing suicide because of depression or coercion by third parties. But the State's legitimate interest in preventing abuse does not apply to an individual who is not victimized by abuse, who is not suffering from depression, and who makes a rational and voluntary decision to seek assistance in dying. Although, as the New York Task Force report discusses, diagnosing depression and other mental illness is not always easy, mental health workers and other professionals expert in working with dying patients can help patients cope with depression and pain, and help patients assess their options. See Brief for Washington State Psychological Association et al. as *Amici Curiae* 8–10.

Relatedly, the State and *amici* express the concern that patients whose physical pain is inadequately treated will be more likely to request assisted suicide. Encouraging the development and ensuring the availability of adequate pain treatment is of utmost importance; palliative care, however, cannot alleviate all pain and suffering. See Orentlicher, Legalization of Physician Assisted Suicide: A Very Modest Revolution, 38 Boston College L. Rev. (Galley, p. 8) (1997) ("Greater use of palliative care would reduce the demand for

assisted suicide, but it will not eliminate [it]"); see also Brief for Coalition of Hospice Professionals as *Amici Curiae* 8 (citing studies showing that "[a]s death becomes more imminent, pain and suffering become progressively more difficult to treat"). An individual adequately informed of the care alternatives thus might make a rational choice for assisted suicide. For such an individual, the State's interest in preventing potential abuse and mistake is only minimally implicated.

The final major interest asserted by the State is its interest in preserving the traditional integrity of the medical profession. The fear is that a rule permitting physicians to assist in suicide is inconsistent with the perception that they serve their patients solely as healers. But for some patients, it would be a physician's refusal to dispense medication to ease their suffering and make their death tolerable and dignified that would be inconsistent with the healing role. See Block & Billings, Patient Request to Hasten Death, 154 Archives Internal Med. 2039, 2045 (1994) (A doctor's refusal to hasten death "may be experienced by the [dying] patient as an abandonment, a rejection, or an expression of inappropriate paternalistic authority"). For doctors who have longstanding relationships with their patients, who have given their patients advice on alternative treatments, who are attentive to their patient's individualized needs, and who are knowledgeable about pain symptom management and palliative care options, see Quill, Death and Dignity, A Case of Individualized Decision Making, 324 New England J. Med. 691–694 (1991), heeding a patient's desire to assist in her suicide would not serve to harm the physician-patient relationship. Furthermore, because physicians are already involved in making decisions that hasten the death of terminally ill patients—through termination of life support, withholding of medical treatment, and terminal sedation—there is in fact significant tension between the traditional view of

the physician's role and the actual practice in a growing number of cases.[12]

As the New York State Task Force on Life and the Law recognized, a State's prohibition of assisted suicide is justified by the fact that the "'ideal'" case in which "patients would be screened for depression and offered treatment, effective pain medication would be available, and all patients would have a supportive committed family and doctor" is not the usual case. New York State Task Force on Life and the Law, When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context 120 (May 1994). Although, as the Court concludes today, these *potential* harms are sufficient to support the State's general public policy against assisted suicide, they will not always outweigh the individual liberty

---

[12] I note that there is evidence that a significant number of physicians support the practice of hastening death in particular situations. A survey published in the New England Journal of Medicine found that 56% of responding doctors in Michigan preferred legalizing assisted suicide to an explicit ban. Bachman et al., Attitudes of Michigan Physicians and the Public Toward Legalizing Physician-Assisted Suicide and Voluntary Euthanasia, 334 New England J. Med. 303–309 (1996). In a survey of Oregon doctors, 60% of the responding doctors supported legalizing assisted suicide for terminally ill patients. See Lee et al., Legalizing Assisted Suicide—Views of Physicians in Oregon, 335 New England J. Med. 310–315 (1996). Another study showed that 12% of physicians polled in Washington State reported that they had been asked by their terminally ill patients for prescriptions to hasten death, and that, in the year prior to the study, 24% of those physicians had complied with such requests. See Back, Wallace, Starks, & Perlman, Physician-Assisted Suicide and Euthanasia in Washington State, 275 JAMA 919–925 (1996); see also Doukas, Waterhouse, Gorenflo, & Seld, Attitudes and Behaviors on Physician-Assisted Death: A Study of Michigan Oncologists, 13 J. Clinical Oncology 1055 (1995) (reporting that 18% of responding Michigan oncologists reported active participation in assisted suicide); Slome, Moulton, Huffine, Gorter, & Abrams, Physicians' Attitudes Toward Assisted Suicide in AIDS, 5 J. Acquired Immune Deficiency Syndromes 712 (1992) (reporting that 24% of responding physicians who treat AIDS patients would likely grant a patient's request for assistance in hastening death).

interest of a particular patient. Unlike the Court of Appeals, I would not say as a categorical matter that these state interests are invalid as to the entire class of terminally ill, mentally competent patients. I do not, however, foreclose the possibility that an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge. Future cases will determine whether such a challenge may succeed.

## IV

In New York, a doctor must respect a competent person's decision to refuse or to discontinue medical treatment even though death will thereby ensue, but the same doctor would be guilty of a felony if she provided her patient assistance in committing suicide.[13] Today we hold that the Equal Protection Clause is not violated by the resulting disparate treatment of two classes of terminally ill people who may have the same interest in hastening death. I agree that the distinction between permitting death to ensue from an underlying fatal disease and causing it to occur by the administration of medication or other means provides a constitutionally sufficient basis for the State's classification.[14] Unlike the Court, however, see *Vacco, post,* at 801–802, I am not persuaded that in all cases there will in fact be a significant difference between the intent of the physicians, the patients, or the families in the two situations.

There may be little distinction between the intent of a terminally ill patient who decides to remove her life support and one who seeks the assistance of a doctor in ending her life; in both situations, the patient is seeking to hasten a certain, impending death. The doctor's intent might also be the same in prescribing lethal medication as it is in terminat-

---

[13] See *Vacco* v. *Quill, post,* at 797, nn. 1 and 2.

[14] The American Medical Association recognized this distinction when it supported Nancy Cruzan and continues to recognize this distinction in its support of the States in these cases.

ing life support. A doctor who fails to administer medical treatment to one who is dying from a disease could be doing so with an intent to harm or kill that patient. Conversely, a doctor who prescribes lethal medication does not necessarily intend the patient's death—rather that doctor may seek simply to ease the patient's suffering and to comply with her wishes. The illusory character of any differences in intent or causation is confirmed by the fact that the American Medical Association unequivocally endorses the practice of terminal sedation—the administration of sufficient dosages of pain-killing medication to terminally ill patients to protect them from excruciating pain even when it is clear that the time of death will be advanced. The purpose of terminal sedation is to ease the suffering of the patient and comply with her wishes, and the actual cause of death is the administration of heavy doses of lethal sedatives. This same intent and causation may exist when a doctor complies with a patient's request for lethal medication to hasten her death.[15]

Thus, although the differences the majority notes in causation and intent between terminating life support and assisting in suicide support the Court's rejection of the respondents' facial challenge, these distinctions may be inapplicable to particular terminally ill patients and their doctors. Our holding today in *Vacco* v. *Quill, post,* p. 793, that the Equal Protection Clause is not violated by New York's classification, just like our holding in *Washington* v. *Glucksberg* that the. Washington statute is not invalid on its face, does not foreclose the possibility that some applications of the New

---

[15] If a doctor prescribes lethal drugs to be self-administered by the patient, it is not at all clear that the physician's intent is that the patient "be made dead," *post,* at 802 (internal quotation marks omitted). Many patients prescribed lethal medications never actually take them; they merely acquire some sense of control in the process of dying that the availability of those medications provides. See Back, *supra* n. 12, at 922; see also Quill, 324 New England J. Med., at 693 (describing how some patients fear death less when they feel they have the option of physician-assisted suicide).

York statute may impose an intolerable intrusion on the patient's freedom.

There remains room for vigorous debate about the outcome of particular cases that are not necessarily resolved by the opinions announced today. How such cases may be decided will depend on their specific facts. In my judgment, however, it is clear that the so-called "unqualified interest in the preservation of human life," *Cruzan*, 497 U. S., at 282; *ante*, at 728, is not itself sufficient to outweigh the interest in liberty that may justify the only possible means of preserving a dying patient's dignity and alleviating her intolerable suffering.

JUSTICE SOUTER, concurring in the judgment.

Three terminally ill individuals and four physicians who sometimes treat terminally ill patients brought this challenge to the Washington statute making it a crime "knowingly . . . [to] ai[d] another person to attempt suicide," Wash. Rev. Code § 9A.36.060 (1994), claiming on behalf of both patients and physicians that it would violate substantive due process to enforce the statute against a doctor who acceded to a dying patient's request for a drug to be taken by the patient to commit suicide. The question is whether the statute sets up one of those "arbitrary impositions" or "purposeless restraints" at odds with the Due Process Clause of the Fourteenth Amendment. *Poe* v. *Ullman*, 367 U. S. 497, 543 (1961) (Harlan, J., dissenting). I conclude that the statute's application to the doctors has not been shown to be unconstitutional, but I write separately to give my reasons for analyzing the substantive due process claims as I do, and for rejecting this one.

I

Although the terminally ill original parties have died during the pendency of this case, the four physicians who remain

as respondents here[1] continue to request declaratory and injunctive relief for their own benefit in discharging their obligations to other dying patients who request their help.[2] See, *e. g., Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911) (question was capable of repetition yet evading review). The case reaches us on an order granting summary judgment, and we must take as true the undisputed allegations that each of the patients was mentally competent and terminally ill, and that each made a knowing and voluntary choice to ask a doctor to prescribe "medications . . . to be self-administered for the purpose of hastening . . . death." Complaint ¶ 2.3. The State does not dispute that each faced a passage to death more agonizing both mentally and physically, and more protracted over time, than death by suicide with a physician's help, or that each would have chosen such a suicide for the sake of personal dignity, apart even from relief from pain. Each doctor in this case claims to encounter patients like the original plaintiffs who have died, that is, mentally competent, terminally ill, and seeking medical help in "the voluntary self-termination of life." *Id.,* ¶¶ 2.5–2.8. While there may be no unanimity on the physician's professional obligation in such circumstances, I accept here respondents' representation that providing such patients with prescriptions for drugs that go beyond pain relief to hasten death would, in these circumstances, be consistent with standards of medical practice. Hence, I take it to be true, as respondents say, that the Washington statute prevents the exercise of a physician's "best professional judgment to prescribe medications to [such] patients in dosages that would enable them to act to hasten their own deaths." *Id.,* ¶ 2.6; see also App. 35–37, 49–51, 55–57, 73–75.

---

[1] A nonprofit corporation known as Compassion in Dying was also a plaintiff and appellee below but is not a party in this Court.

[2] As I will indicate in some detail below, I see the challenge to the statute not as facial but as-applied, and I understand it to be in narrower terms than those accepted by the Court.

In their brief to this Court, the doctors claim not that they ought to have a right generally to hasten patients' imminent deaths, but only to help patients who have made "personal decisions regarding their own bodies, medical care, and, fundamentally, the future course of their lives," Brief for Respondents 12, and who have concluded responsibly and with substantial justification that the brief and anguished remainders of their lives have lost virtually all value to them. Respondents fully embrace the notion that the State must be free to impose reasonable regulations on such physician assistance to ensure that the patients they assist are indeed among the competent and terminally ill and that each has made a free and informed choice in seeking to obtain and use a fatal drug. Complaint ¶ 3.2; App. 28–41.

In response, the State argues that the interest asserted by the doctors is beyond constitutional recognition because it has no deep roots in our history and traditions. Brief for Petitioners 21–25. But even aside from that, without disputing that the patients here were competent and terminally ill, the State insists that recognizing the legitimacy of doctors' assistance of their patients as contemplated here would entail a number of adverse consequences that the Washington Legislature was entitled to forestall. The nub of this part of the State's argument is not that such patients are constitutionally undeserving of relief on their own account, but that any attempt to confine a right of physician assistance to the circumstances presented by these doctors is likely to fail. *Id.*, at 34–35, 44–47.

First, the State argues that the right could not be confined to the terminally ill. Even assuming a fixed definition of that term, the State observes that it is not always possible to say with certainty how long a person may live. *Id.*, at 34. It asserts that "[t]here is no principled basis on which [the right] can be limited to the prescription of medication for terminally ill patients to administer to themselves" when the right's justifying principle is as broad as " 'merciful termina-

tion of suffering.'" *Id.*, at 45 (citing Y. Kamisar, Are Laws Against Assisted Suicide Unconstitutional?, Hastings Center Report 32, 36–37 (May–June 1993)). Second, the State argues that the right could not be confined to the mentally competent, observing that a person's competence cannot always be assessed with certainty, Brief for Petitioners 34, and suggesting further that no principled distinction is possible between a competent patient acting independently and a patient acting through a duly appointed and competent surrogate, *id.*, at 46. Next, according to the State, such a right might entail a right to or at least merge in practice into "other forms of life-ending assistance," such as euthanasia. *Id.*, at 46–47. Finally, the State believes that a right to physician assistance could not easily be distinguished from a right to assistance from others, such as friends, family, and other health-care workers. *Id.*, at 47. The State thus argues that recognition of the substantive due process right at issue here would jeopardize the lives of others outside the class defined by the doctors' claim, creating risks of irresponsible suicides and euthanasia, whose dangers are concededly within the State's authority to address.

## II

When the physicians claim that the Washington law deprives them of a right falling within the scope of liberty that the Fourteenth Amendment guarantees against denial without due process of law,[3] they are not claiming some sort of procedural defect in the process through which the statute has been enacted or is administered. Their claim, rather, is that the State has no substantively adequate justification for barring the assistance sought by the patient and sought to be offered by the physician. Thus, we are dealing with a claim to one of those rights sometimes described as rights

---

[3] The doctors also rely on the Equal Protection Clause, but that source of law does essentially nothing in a case like this that the Due Process Clause cannot do on its own.

of substantive due process and sometimes as unenumerated rights, in view of the breadth and indeterminacy of the "due process" serving as the claim's textual basis. The doctors accordingly arouse the skepticism of those who find the Due Process Clause an unduly vague or oxymoronic warrant for judicial review of substantive state law, just as they also invoke two centuries of American constitutional practice in recognizing unenumerated, substantive limits on governmental action. Although this practice has neither rested on any single textual basis nor expressed a consistent theory (or, before *Poe* v. *Ullman*, a much articulated one), a brief overview of its history is instructive on two counts. The persistence of substantive due process in our cases points to the legitimacy of the modern justification for such judicial review found in Justice Harlan's dissent in *Poe*,[4] on which I will dwell further on, while the acknowledged failures of some of these cases point with caution to the difficulty raised by the present claim.

Before the ratification of the Fourteenth Amendment, substantive constitutional review resting on a theory of unenumerated rights occurred largely in the state courts applying state constitutions that commonly contained either due process clauses like that of the Fifth Amendment (and later the Fourteenth) or the textual antecedents of such clauses, re-

---

[4] The status of the Harlan dissent in *Poe* v. *Ullman*, 367 U. S. 497 (1961), is shown by the Court's adoption of its result in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), and by the Court's acknowledgment of its status and adoption of its reasoning in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 848–849 (1992). See also *Youngberg* v. *Romeo*, 457 U. S. 307, 320 (1982) (citing Justice Harlan's *Poe* dissent as authority for the requirement that this Court balance "the liberty of the individual" and "the demands of an organized society"); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 619 (1984); *Moore* v. *East Cleveland*, 431 U. S. 494, 500–506, and n. 12 (1977) (plurality opinion) (opinion for four Justices treating Justice Harlan's *Poe* dissent as a central explication of the methodology of judicial review under the Due Process Clause).

peating Magna Carta's guarantee of "the law of the land."[5] On the basis of such clauses, or of general principles untethered to specific constitutional language, state courts evaluated the constitutionality of a wide range of statutes.

Thus, a Connecticut court approved a statute legitimating a class of previous illegitimate marriages, as falling within the terms of the "social compact," while making clear its power to review constitutionality in those terms. *Goshen* v. *Stonington*, 4 Conn. 209, 225–226 (1822). In the same period, a specialized court of equity, created under a Tennessee statute solely to hear cases brought by the state bank against its debtors, found its own authorization unconstitutional as "partial" legislation violating the State Constitution's "law of the land" clause. *Bank of the State* v. *Cooper*, 2 Yerg. 599, 602–608 (Tenn. 1831) (opinion of Green, J.); *id.*, at 613–615 (opinion of Peck, J.); *id.*, at 618–623 (opinion of Kennedy, J.). And the middle of the 19th century brought the famous *Wynehamer* case, invalidating a statute purporting to render possession of liquor immediately illegal except when kept for narrow, specified purposes, the state court finding the statute inconsistent with the State's due process clause. *Wynehamer* v. *People*, 13 N. Y. 378, 486–487 (1856). The statute was deemed an excessive threat to the "fundamental rights of the citizen" to property. *Id.*, at 398 (opinion of Comstock, J.). See generally E. Corwin, Liberty Against Government 58–115 (1948) (discussing substantive due process in the state courts before the Civil War); T. Cooley, Constitutional Limitations *85–*129, *351–*397.

Even in this early period, however, this Court anticipated the developments that would presage both the Civil War and the ratification of the Fourteenth Amendment, by making it clear on several occasions that it too had no doubt of the

---

[5] Coke indicates that prohibitions against deprivations without "due process of law" originated in an English statute that "rendred" Magna Carta's "law of the land" in such terms. See 2 E. Coke, Institutes 50 (1797); see also E. Corwin, Liberty Against Government 90–91 (1948).

judiciary's power to strike down legislation that conflicted with important but unenumerated principles of American government. In most such instances, after declaring its power to invalidate what it might find inconsistent with rights of liberty and property, the Court nevertheless went on to uphold the legislative Acts under review. See, e. g., *Wilkinson* v. *Leland*, 2 Pet. 627, 656–661 (1829); *Calder* v. *Bull*, 3 Dall. 386, 386–395 (1798) (opinion of Chase, J.); see also *Corfield* v. *Coryell*, 6 F. Cas. 546, 550–552 (No. 3,230) (CC ED Pa. 1823). But in *Fletcher* v. *Peck*, 6 Cranch 87 (1810), the Court went further. It struck down an Act of the Georgia Legislature that purported to rescind a sale of public land *ab initio* and reclaim title for the State, and so deprive subsequent, good-faith purchasers of property conveyed by the original grantees. The Court rested the invalidation on alternative sources of authority: the specific prohibitions against bills of attainder, *ex post facto* laws, laws impairing contracts in Article I, § 10, of the Constitution; and "general principles which are common to our free institutions," by which Chief Justice Marshall meant that a simple deprivation of property by the State could not be an authentically "legislative" Act. *Fletcher, supra*, at 135–139.

*Fletcher* was not, though, the most telling early example of such review. For its most salient instance in this Court before the adoption of the Fourteenth Amendment was, of course, the case that the Amendment would in due course overturn, *Dred Scott* v. *Sandford*, 19 How. 393 (1857). Unlike *Fletcher*, *Dred Scott* was textually based on a Due Process Clause (in the Fifth Amendment, applicable to the National Government), and it was in reliance on that Clause's protection of property that the Court invalidated the Missouri Compromise. 19 How., at 449–452. This substantive protection of an owner's property in a slave taken to the territories was traced to the absence of any enumerated power to affect that property granted to the Congress by Article I of the Constitution, *id.*, at 451–452, the implication

being that the Government had no legitimate interest that could support the earlier congressional compromise. The ensuing judgment of history needs no recounting here.

After the ratification of the Fourteenth Amendment, with its guarantee of due process protection against the States, interpretation of the words "liberty" and "property" as used in Due Process Clauses became a sustained enterprise, with the Court generally describing the due process criterion in converse terms of reasonableness or arbitrariness. That standard is fairly traceable to Justice Bradley's dissent in the *Slaughter-House Cases*, 16 Wall. 36 (1873), in which he said that a person's right to choose a calling was an element of liberty (as the calling, once chosen, was an aspect of property) and declared that the liberty and property protected by due process are not truly recognized if such rights may be "arbitrarily assailed," *id.*, at 116.[6] After that, opinions comparable to those that preceded *Dred Scott* expressed willingness to review legislative action for consistency with the Due Process Clause even as they upheld the laws in question. See, *e. g., Bartemeyer* v. *Iowa*, 18 Wall. 129, 133–135 (1874); *Munn* v. *Illinois*, 94 U. S. 113, 123–135 (1877); *Railroad Comm'n Cases*, 116 U. S. 307, 331 (1886); *Mugler* v.

---

[6] The *Slaughter-House Cases* are important, of course, for their holding that the Privileges and Immunities Clause was no source of any but a specific handful of substantive rights. 16 Wall., at 74–80. To a degree, then, that decision may have led the Court to look to the Due Process Clause as a source of substantive rights. In *Twining* v. *New Jersey*, 211 U. S. 78, 95–97 (1908), for example, the Court of the *Lochner* Era acknowledged the strength of the case against *Slaughter-House*'s interpretation of the Privileges or Immunities Clause but reaffirmed that interpretation without questioning its own frequent reliance on the Due Process Clause as authorization for substantive judicial review. See also J. Ely, Democracy and Distrust 14–30 (1980) (arguing that the Privileges and Immunities Clause and not the Due Process Clause is the proper warrant for courts' substantive oversight of state legislation). But the courts' use of Due Process Clauses for that purpose antedated the 1873 decision, as we have seen, and would in time be supported in the *Poe* dissent, as we shall see.

*Kansas,* 123 U. S. 623, 659–670 (1887). See generally Corwin, *supra,* at 121–136 (surveying the Court's early Fourteenth Amendment cases and finding little dissent from the general principle that the Due Process Clause authorized judicial review of substantive statutes).

The theory became serious, however, beginning with *Allgeyer* v. *Louisiana,* 165 U. S. 578 (1897), where the Court invalidated a Louisiana statute for excessive interference with Fourteenth Amendment liberty to contract, *id.,* at 588–593, and offered a substantive interpretation of "liberty," that in the aftermath of the so-called *Lochner* Era has been scaled back in some respects, but expanded in others, and never repudiated in principle. The Court said that Fourteenth Amendment liberty includes "the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." *Id.,* at 589. "[W]e do not intend to hold that in no such case can the State exercise its police power," the Court added, but "[w]hen and how far such power may be legitimately exercised with regard to these subjects must be left for determination to each case as it arises." *Id.,* at 590.

Although this principle was unobjectionable, what followed for a season was, in the realm of economic legislation, the echo of *Dred Scott. Allgeyer* was succeeded within a decade by *Lochner* v. *New York,* 198 U. S. 45 (1905), and the era to which that case gave its name, famous now for striking down as arbitrary various sorts of economic regulations that post-New Deal courts have uniformly thought constitutionally sound. Compare, *e. g., id.,* at 62 (finding New York's maximum-hours law for bakers "unreasonable and entirely arbitrary"), and *Adkins* v. *Children's Hospital of D. C.,* 261

U. S. 525, 559 (1923) (holding a minimum-wage law "so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States"), with *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, 391 (1937) (overruling *Adkins* and approving a minimum-wage law on the principle that "regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process"). As the parentheticals here suggest, while the cases in the *Lochner* line routinely invoked a correct standard of constitutional arbitrariness review, they harbored the spirit of *Dred Scott* in their absolutist implementation of the standard they espoused.

Even before the deviant economic due process cases had been repudiated, however, the more durable precursors of modern substantive due process were reaffirming this Court's obligation to conduct arbitrariness review, beginning with *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). Without referring to any specific guarantee of the Bill of Rights, the Court invoked precedents from the *Slaughter-House Cases* through *Adkins* to declare that the Fourteenth Amendment protected "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." 262 U. S., at 399. The Court then held that the same Fourteenth Amendment liberty included a teacher's right to teach and the rights of parents to direct their children's education without unreasonable interference by the States, *id.*, at 400, with the result that Nebraska's prohibition on the teaching of foreign languages in the lower grades was "arbitrary and without reasonable relation to any end within the competency of the State," *id.*, at 403. See also *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–536 (1925)

(finding that a statute that all but outlawed private schools lacked any "reasonable relation to some purpose within the competency of the State"); *Palko* v. *Connecticut,* 302 U. S. 319, 327–328 (1937) ("[E]ven in the field of substantive rights and duties the legislative judgment, if oppressive and arbitrary, may be overridden by the courts." "Is that [injury] to which the statute has subjected [the appellant] a hardship so acute and shocking that our polity will not endure it? Does it violate those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions?" (citation and internal quotation marks omitted)).

After *Meyer* and *Pierce,* two further opinions took the major steps that lead to the modern law. The first was not even in a due process case but one about equal protection, *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942), where the Court emphasized the "fundamental" nature of individual choice about procreation and so foreshadowed not only the later prominence of procreation as a subject of liberty protection, but the corresponding standard of "strict scrutiny," in this Court's Fourteenth Amendment law. See *id.,* at 541. *Skinner,* that is, added decisions regarding procreation to the list of liberties recognized in *Meyer* and *Pierce* and loosely suggested, as a gloss on their standard of arbitrariness, a judicial obligation to scrutinize any impingement on such an important interest with heightened care. In so doing, it suggested a point that Justice Harlan would develop, that the kind and degree of justification that a sensitive judge would demand of a State would depend on the importance of the interest being asserted by the individual. *Poe,* 367 U. S., at 543.

The second major opinion leading to the modern doctrine was Justice Harlan's *Poe* dissent just cited, the conclusion of which was adopted in *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), and the authority of which was acknowledged in *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). See also n. 4, *supra.* The dissent is important

for three things that point to our responsibilities today. The first is Justice Harlan's respect for the tradition of substantive due process review itself, and his acknowledgment of the Judiciary's obligation to carry it on. For two centuries American courts, and for much of that time this Court, have thought it necessary to provide some degree of review over the substantive content of legislation under constitutional standards of textual breadth. The obligation was understood before *Dred Scott* and has continued after the repudiation of *Lochner's* progeny, most notably on the subjects of segregation in public education, *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954), interracial marriage, *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967), marital privacy and contraception, *Carey* v. *Population Services Int'l,* 431 U. S. 678, 684–691 (1977); *Griswold* v. *Connecticut, supra,* at 481–486, abortion, *Planned Parenthood of Southeastern Pa.* v. *Casey, supra,* at 849, 869–879 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *Roe* v. *Wade,* 410 U. S. 113, 152–166 (1973), personal control of medical treatment, *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 287–289 (1990) (O'CONNOR, J., concurring); *id.,* at 302 (Brennan, J., dissenting); *id.,* at 331 (STEVENS, J., dissenting); see also *id.,* at 278 (majority opinion), and physical confinement, *Foucha* v. *Louisiana,* 504 U. S. 71, 80–83 (1992). This enduring tradition of American constitutional practice is, in Justice Harlan's view, nothing more than what is required by the judicial authority and obligation to construe constitutional text and review legislation for conformity to that text. See *Marbury* v. *Madison,* 1 Cranch 137 (1803). Like many judges who preceded him and many who followed, he found it impossible to construe the text of due process without recognizing substantive, and not merely procedural, limitations. "Were due process merely a procedural safeguard it would fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in ap-

plication to individuals, nevertheless destroy the enjoyment of all three." *Poe, supra,* at 541.[7] The text of the Due Process Clause thus imposes nothing less than an obligation to give substantive content to the words "liberty" and "due process of law."

Following the first point of the *Poe* dissent, on the necessity to engage in the sort of examination we conduct today, the dissent's second and third implicitly address those cases, already noted, that are now condemned with virtual unanimity as disastrous mistakes of substantive due process review. The second of the dissent's lessons is a reminder that the business of such review is not the identification of extratextual absolutes but scrutiny of a legislative resolution (perhaps unconscious) of clashing principles, each quite possibly worthy in and of itself, but each to be weighed within the history of our values as a people. It is a comparison of the relative strengths of opposing claims that informs the judicial task, not a deduction from some first premise. Thus informed, judicial review still has no warrant to substitute one reasonable resolution of the contending positions for another, but authority to supplant the balance already struck between the contenders only when it falls outside the realm of the reasonable. Part III, below, deals with this second point, and also with the dissent's third, which takes the form of an

---

[7] Judge Johnson of the New York Court of Appeals had made the point more obliquely a century earlier when he wrote that "the form of this declaration of right, 'no person shall be deprived of life, liberty or property, without due process of law,' necessarily imports that the legislature cannot make the mere existence of the rights secured the occasion of depriving a person of any of them, even by the forms which belong to 'due process of law.' For if it does not necessarily import this, then the legislative power is absolute." And, "[t]o provide for a trial to ascertain whether a man is in the enjoyment of [any] of these rights, and then, as a consequence of finding that he is in the enjoyment of it, to deprive him of it, is doing indirectly just what is forbidden to be done directly, and reduces the constitutional provision to a nullity." *Wynehamer* v. *People,* 13 N. Y. 378, 420 (1856).

object lesson in the explicit attention to detail that is no less essential to the intellectual discipline of substantive due process review than an understanding of the basic need to account for the two sides in the controversy and to respect legislation within the zone of reasonableness.

### III

My understanding of unenumerated rights in the wake of the *Poe* dissent and subsequent cases avoids the absolutist failing of many older cases without embracing the opposite pole of equating reasonableness with past practice described at a very specific level. See *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S., at 847–849. That understanding begins with a concept of "ordered liberty," *Poe*, 367 U. S., at 549 (Harlan, J.); see also *Griswold*, 381 U. S., at 500, comprising a continuum of rights to be free from "arbitrary impositions and purposeless restraints," *Poe*, 367 U. S., at 543 (Harlan, J., dissenting).

"Due Process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could

serve as a substitute, in this area, for judgment and re-straint." *Id.*, at 542.

See also *Moore* v. *East Cleveland,* 431 U. S. 494, 503 (1977) (plurality opinion of Powell, J.) ("Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society'") (quoting *Griswold, supra,* at 501 (Harlan, J., concurring)).

After the *Poe* dissent, as before it, this enforceable concept of liberty would bar statutory impositions even at relatively trivial levels when governmental restraints are undeniably irrational as unsupported by any imaginable rationale. See, *e. g., United States* v. *Carolene Products Co.,* 304 U. S. 144, 152 (1938) (economic legislation "not . . . unconstitutional unless . . . facts . . . preclude the assumption that it rests upon some rational basis"); see also *Poe, supra,* at 545, 548 (Harlan, J., dissenting) (referring to usual "presumption of constitutionality" and ordinary test "going merely to the plausibility of [a statute's] underlying rationale"). Such instances are suitably rare. The claims of arbitrariness that mark almost all instances of unenumerated substantive rights are those resting on "certain interests requir[ing] particularly careful scrutiny of the state needs asserted to justify their abridgment[,] [c]f. *Skinner* v. *Oklahoma* [*ex rel. Williamson,* 316 U. S. 535 (1942)]; *Bolling* v. *Sharpe,* [347 U. S. 497 (1954)]," *id.*, at 543; that is, interests in liberty sufficiently important to be judged "fundamental," *id.*, at 548; see also *id.*, at 541 (citing *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 380 (CC ED Pa. 1825)). In the face of an interest this powerful a State may not rest on threshold rationality or a presumption of constitutionality, but may prevail only on the ground of an interest sufficiently compelling to place within the realm of the reasonable a refusal to recognize the individual right asserted. *Poe, supra,* at 548 (Harlan, J., dissenting) (an "enactment involv[ing] . . . a most fundamental as-

pect of 'liberty' . . . [is] subjec[t] to 'strict scrutiny' ") (quoting *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S., at 541);[8] *Reno* v. *Flores,* 507 U. S. 292, 301–302 (1993) (reaffirming that due process "forbids the government to infringe certain 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest").[9]

This approach calls for a court to assess the relative "weights" or dignities of the contending interests, and to this extent the judicial method is familiar to the common law. Common-law method is subject, however, to two important constraints in the hands of a court engaged in substantive due process review. First, such a court is bound to confine the values that it recognizes to those truly deserving constitutional stature, either to those expressed in constitutional text, or those exemplified by "the traditions from which [the Nation] developed," or revealed by contrast with "the traditions from which it broke." *Poe,* 367 U. S., at 542 (Harlan, J., dissenting). " 'We may not draw on our merely personal and private notions and disregard the limits . . . derived from

[8] We have made it plain, of course, that not every law that incidentally makes it somewhat harder to exercise a fundamental liberty must be justified by a compelling counterinterest. See *Casey,* 505 U. S., at 872–876 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *Carey* v. *Population Services Int'l,* 431 U. S. 678, 685–686 (1977) ("[A]n individual's [constitutionally protected] liberty to make choices regarding contraception does not . . . automatically invalidate every state regulation in this area. The business of manufacturing and selling contraceptives may be regulated in ways that do not [even] infringe protected individual choices"). But a state law that creates a "substantial obstacle," *Casey, supra,* at 877, for the exercise of a fundamental liberty interest requires a commensurably substantial justification in order to place the legislation within the realm of the reasonable.

[9] Justice Harlan thus recognized just what the Court today assumes, that by insisting on a threshold requirement that the interest (or, as the Court puts it, the right) be fundamental before anything more than rational basis justification is required, the Court ensures that not every case will require the "complex balancing" that heightened scrutiny entails. See *ante,* at 722.

considerations that are fused in the whole nature of our judicial process . . . [,] considerations deeply rooted in reason and in the compelling traditions of the legal profession.'" *Id.*, at 544–545 (quoting *Rochin* v. *California,* 342 U. S. 165, 170–171 (1952)); see also *Palko* v. *Connecticut,* 302 U. S., at 325 (looking to "'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental'") (quoting *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934)).

The second constraint, again, simply reflects the fact that constitutional review, not judicial lawmaking, is a court's business here. The weighing or valuing of contending interests in this sphere is only the first step, forming the basis for determining whether the statute in question falls inside or outside the zone of what is reasonable in the way it resolves the conflict between the interests of state and individual. See, *e. g., Poe, supra,* at 553 (Harlan, J., dissenting); *Youngberg* v. *Romeo,* 457 U. S. 307, 320–321 (1982). It is no justification for judicial intervention merely to identify a reasonable resolution of contending values that differs from the terms of the legislation under review. It is only when the legislation's justifying principle, critically valued, is so far from being commensurate with the individual interest as to be arbitrarily or pointlessly applied that the statute must give way. Only if this standard points against the statute can the individual claimant be said to have a constitutional right. See *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S., at 279 ("[D]etermining that a person has a 'liberty interest' under the Due Process Clause does not end the inquiry; 'whether [the individual's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests'") (quoting *Youngberg* v. *Romeo, supra,* at 321).[10]

---

[10] Our cases have used various terms to refer to fundamental liberty interests, see, *e. g., Poe,* 367 U. S., at 545 (Harlan, J., dissenting) ("'basic liberty'") (quoting *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535,

The *Poe* dissent thus reminds us of the nature of review for reasonableness or arbitrariness and the limitations entailed by it. But the opinion cautions against the repetition of past error in another way as well, more by its example than by any particular statement of constitutional method: it reminds us that the process of substantive review by reasoned judgment, *Poe*, 367 U. S., at 542–544, is one of close criticism going to the details of the opposing interests and to their relationships with the historically recognized principles that lend them weight or value.

Although the *Poe* dissent disclaims the possibility of any general formula for due process analysis (beyond the basic analytic structure just described), see *id.*, at 542, 544, Justice Harlan of course assumed that adjudication under the Due Process Clauses is like any other instance of judgment dependent on common-law method, being more or less persuasive according to the usual canons of critical discourse. See also *Casey*, 505 U. S., at 849 ("The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment"). When identifying and assessing the competing interests of liberty and authority, for ex-

---

541 (1942)); *Poe, supra,* at 543 (Harlan, J., dissenting) ("certain interests" must bring "particularly careful scrutiny"); *Casey,* 505 U. S., at 851 ("protected liberty"); *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 278 (1990) ("constitutionally protected liberty interest"); *Youngberg* v. *Romeo,* 457 U. S., at 315 ("liberty interests"), and at times we have also called such an interest a "right" even before balancing it against the government's interest, see, *e. g., Roe* v. *Wade,* 410 U. S. 113, 153–154 (1973); *Carey* v. *Population Services Int'l, supra,* at 686, 688, and n. 5; *Poe, supra,* at 541 ("rights 'which are . . . *fundamental'* ") (quoting *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 380 (CC ED Pa. 1825)). Precision in terminology, however, favors reserving the label "right" for instances in which the individual's liberty interest actually trumps the government's countervailing interests; only then does the individual have anything legally enforceable as against the State's attempt at regulation.

ample, the breadth of expression that a litigant or a judge selects in stating the competing principles will have much to do with the outcome and may be dispositive. As in any process of rational argumentation, we recognize that when a generally accepted principle is challenged, the broader the attack the less likely it is to succeed. The principle's defenders will, indeed, often try to characterize any challenge as just such a broadside, perhaps by couching the defense as if a broadside attack had occurred. So the Court in *Dred Scott* treated prohibition of slavery in the Territories as nothing less than a general assault on the concept of property. See 19 How., at 449–452.

Just as results in substantive due process cases are tied to the selections of statements of the competing interests, the acceptability of the results is a function of the good reasons for the selections made. It is here that the value of common-law method becomes apparent, for the usual thinking of the common law is suspicious of the all-or-nothing analysis that tends to produce legal petrification instead of an evolving boundary between the domains of old principles. Common-law method tends to pay respect instead to detail, seeking to understand old principles afresh by new examples and new counterexamples. The "tradition is a living thing," *Poe*, 367 U. S., at 542 (Harlan, J., dissenting), albeit one that moves by moderate steps carefully taken. "The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria. The new decision must take its place in relation to what went before and further [cut] a channel for what is to come." *Id.*, at 544 (Harlan, J., dissenting) (internal quotation marks omitted). Exact analysis and characterization of any due process claim are critical to the method and to the result.

So, in *Poe*, Justice Harlan viewed it as essential to the plaintiffs' claimed right to use contraceptives that they sought to do so within the privacy of the marital bedroom. This detail in fact served two crucial and complementary

functions, and provides a lesson for today. It rescued the individuals' claim from a breadth that would have threatened all state regulation of contraception or intimate relations; extramarital intimacy, no matter how privately practiced, was outside the scope of the right Justice Harlan would have recognized in that case. See *id.*, at 552–553. It was, moreover, this same restriction that allowed the interest to be valued as an aspect of a broader liberty to be free from all unreasonable intrusions into the privacy of the home and the family life within it, a liberty exemplified in constitutional provisions such as the Third and Fourth Amendments, in prior decisions of the Court involving unreasonable intrusions into the home and family life, and in the then-prevailing status of marriage as the sole lawful locus of intimate relations. *Id.*, at 548, 551.[11] The individuals' interest was therefore at its peak in *Poe,* because it was supported by a principle that distinguished of its own force between areas in which government traditionally had regulated (sexual relations outside of marriage) and those in which it had not (private marital intimacies), and thus was broad enough to cover the claim at hand without being so broad as to be shot-through by exceptions.

---

[11] Thus, as the *Poe* dissent illustrates, the task of determining whether the concrete right claimed by an individual in a particular case falls within the ambit of a more generalized protected liberty requires explicit analysis when what the individual wants to do could arguably be characterized as belonging to different strands of our legal tradition requiring different degrees of constitutional scrutiny. See also Tribe & Dorf, Levels of Generality in the Definition of Rights, 57 U. Chi. L. Rev. 1057, 1091 (1990) (abortion might conceivably be assimilated either to the tradition regarding women's reproductive freedom in general, which places a substantial burden of justification on the State, or to the tradition regarding protection of fetuses, as embodied in laws criminalizing feticide by someone other than the mother, which generally requires only rationality on the part of the State). Selecting among such competing characterizations demands reasoned judgment about which broader principle, as exemplified in the concrete privileges and prohibitions embodied in our legal tradition, best fits the particular claim asserted in a particular case.

On the other side of the balance, the State's interest in *Poe* was not fairly characterized simply as preserving sexual morality, or doing so by regulating contraceptive devices. Just as some of the earlier cases went astray by speaking without nuance of individual interests in property or autonomy to contract for labor, so the State's asserted interest in *Poe* was not immune to distinctions turning (at least potentially) on the precise purpose being pursued and the collateral consequences of the means chosen, see *id.*, at 547–548. It was assumed that the State might legitimately enforce limits on the use of contraceptives through laws regulating divorce and annulment, or even through its tax policy, *ibid.*, but not necessarily be justified in criminalizing the same practice in the marital bedroom, which would entail the consequence of authorizing state enquiry into the intimate relations of a married couple who chose to close their door, *id.*, at 548–549. See also *Casey*, 505 U. S., at 869 (strength of State's interest in potential life varies depending on precise context and character of regulation pursuing that interest).

The same insistence on exactitude lies behind questions, in current terminology, about the proper level of generality at which to analyze claims and counterclaims, and the demand for fitness and proper tailoring of a restrictive statute is just another way of testing the legitimacy of the generality at which the government sets up its justification.[12]   We may

---

[12] The dual dimensions of the strength and the fitness of the government's interest are succinctly captured in the so-called "compelling interest test," under which regulations that substantially burden a constitutionally protected (or "fundamental") liberty may be sustained only if "narrowly tailored to serve a compelling state interest," *Reno* v. *Flores*, 507 U. S. 292, 302 (1993); see also, *e. g.*, *Roe* v. *Wade*, 410 U. S., at 155; *Carey* v. *Population Services Int'l*, 431 U. S., at 686.   How compelling the interest and how narrow the tailoring must be will depend, of course, not only on the substantiality of the individual's own liberty interest, but also on the extent of the burden placed upon it, see *Casey*, 505 U. S., at 871–874 (opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *Carey*, *supra*, at 686.

therefore classify Justice Harlan's example of proper analysis in any of these ways: as applying concepts of normal critical reasoning, as pointing to the need to attend to the levels of generality at which countervailing interests are stated, or as examining the concrete application of principles for fitness with their own ostensible justifications. But whatever the categories in which we place the dissent's example, it stands in marked contrast to earlier cases whose reasoning was marked by comparatively less discrimination, and it points to the importance of evaluating the claims of the parties now before us with comparable detail. For here we are faced with an individual claim not to a right on the part of just anyone to help anyone else commit suicide under any circumstances, but to the right of a narrow class to help others also in a narrow class under a set of limited circumstances. And the claimants are met with the State's assertion, among others, that rights of such narrow scope cannot be recognized without jeopardy to individuals whom the State may concededly protect through its regulations.

## IV

### A

Respondents claim that a patient facing imminent death, who anticipates physical suffering and indignity, and is capable of responsible and voluntary choice, should have a right to a physician's assistance in providing counsel and drugs to be administered by the patient to end life promptly. Complaint ¶ 3.1. They accordingly claim that a physician must have the corresponding right to provide such aid, contrary to the provisions of Wash. Rev. Code § 9A.36.060 (1994). I do not understand the argument to rest on any assumption that rights either to suicide or to assistance in committing it are historically based as such. Respondents, rather, acknowledge the prohibition of each historically, but rely on the fact that to a substantial extent the State has repudiated that history. The result of this, respondents say, is to open

the door to claims of such a patient to be accorded one of the options open to those with different, traditionally cognizable claims to autonomy in deciding how their bodies and minds should be treated. They seek the option to obtain the services of a physician to give them the benefit of advice and medical help, which is said to enjoy a tradition so strong and so devoid of specifically countervailing state concern that denial of a physician's help in these circumstances is arbitrary when physicians are generally free to advise and aid those who exercise other rights to bodily autonomy.

1

The dominant western legal codes long condemned suicide and treated either its attempt or successful accomplishment as a crime, the one subjecting the individual to penalties, the other penalizing his survivors by designating the suicide's property as forfeited to the government. See 4 W. Blackstone, Commentaries *188–*189 (commenting that English law considered suicide to be "ranked . . . among the highest crimes" and deemed persuading another to commit suicide to be murder); see generally Marzen, O'Dowd, Crone, & Balch, Suicide: A Constitutional Right?, 24 Duquesne L. Rev. 1, 56–63 (1985). While suicide itself has generally not been considered a punishable crime in the United States, largely because the common-law punishment of forfeiture was rejected as improperly penalizing an innocent family, see id., at 98–99, most States have consistently punished the act of assisting a suicide as either a common-law or statutory crime and some continue to view suicide as an unpunishable crime. See generally id., at 67–100, 148–242.[13] Criminal prohibi-

---

[13] Washington and New York are among the minority of States to have criminalized attempted suicide, though neither State still does so. See Brief for Members of the New York and Washington State Legislatures as Amicus Curiae 15, n. 8 (listing state statutes). The common law governed New York as a Colony and the New York Constitution of 1777 recognized the common law, N. Y. Const. of 1777, Art. XXXV,·and the state legislature recognized common-law crimes by statute in 1788. See Act of

tions on such assistance remain widespread, as exemplified in the Washington statute in question here.[14]

The principal significance of this history in the State of Washington, according to respondents, lies in its repudiation

Feb. 21, 1788, ch. 37, § 2, 1788 N. Y. Laws 664 (codified at 2 N. Y. Laws 73 (Greenleaf 1792)). In 1828, New York changed the common-law offense of assisting suicide from murder to manslaughter in the first degree. See 2 N. Y. Rev. Stat. pt. 4, ch. 1, tit. 2, art. 1, § 7, p. 661 (1829). In 1881, New York adopted a new penal code making attempted suicide a crime punishable by two years in prison, a fine, or both, and retaining the criminal prohibition against assisting suicide as manslaughter in the first degree. Act of July 26, 1881, ch. 676, §§ 172–178, 1881 N. Y. Laws (3 Penal Code), pp. 42–43 (codified at 4 N. Y. Consolidated Laws, Penal Law §§ 2300–2306, pp. 2809–2810 (1909)). In 1919, New York repealed the statutory provision making attempted suicide a crime. See Act of May 5, 1919, ch. 414, § 1, 1919 N. Y. Laws 1193. The 1937 New York Report of the Law Revision Commission found that the history of the ban on assisting suicide was "traceable into the ancient common law when a suicide or *felo de se* was guilty of crime punishable by forfeiture of his goods and chattels." State of New York, Report of the Law Revision Commission for 1937, p. 830. The report stated that since New York had removed "all stigma [of suicide] as a crime" and that "[s]ince liability as an accessory could no longer hinge upon the crime of a principal, it was necessary to define it as a substantive offense." *Id.*, at 831. In 1965, New York revised its penal law, providing that a "person is guilty of manslaughter in the second degree when . . . he intentionally causes or aids another person to commit suicide." Penal Law, ch. 1030, 1965 N. Y. Laws 2387 (codified at N. Y. Penal Law § 125.15(3) (McKinney 1975)).

Washington's first territorial legislature designated assisting another "in the commission of self-murder" to be manslaughter, see Act of Apr. 28, 1854, § 17, 1854 Wash. Laws 78, and reenacted the provision in 1869 and 1873, see Act of Dec. 2, 1869, § 17, 1869 Wash. Laws 201; Act of Nov. 10, 1873, § 19, 1873 Wash. Laws 184 (codified at Wash. Code § 794 (1881)). In 1909, the state legislature enacted a law based on the 1881 New York law and a similar one enacted in Minnesota, see Marzen, O'Dowd, Crone, & Balch, 24 Duquesne L. Rev., at 206, making attempted suicide a crime punishable by two years in prison or a fine, and retaining the criminal prohibition against assisting suicide, designating it manslaughter. See Criminal Code, ch. 249, §§ 133–137, 1909 Wash. Laws, 11th Sess., 890, 929 (codified at Remington & Ballinger's Wash. Code §§ 2385–2389

of the old tradition to the extent of eliminating the criminal suicide prohibitions.  Respondents do not argue that the State's decision goes further, to imply that the State has repudiated any legitimate claim to discourage suicide or to limit its encouragement.  The reasons for the decriminalization, after all, may have had more to do with difficulties of law enforcement than with a shift in the value ascribed to

(1910)).  In 1975, the Washington Legislature repealed these provisions, see Wash. Crim. Code, 1975, ch. 260, § 9A.92.010 (213–217), 1975 Wash. Laws 817, 858, 866, and enacted the ban on assisting suicide at issue in this case, see Wash. Crim. Code, 1975, ch. 260, § 9A.36.060, 1975 Wash. Laws 817, 836, codified at Rev. Wash. Code § 9A.36.060 (1977).  The decriminalization of attempted suicide reflected the view that a person compelled to attempt it should not be punished if the attempt proved unsuccessful.  See *Compassion in Dying* v. *Washington,* 850 F. Supp. 1454, 1464, n. 9 (WD Wash. 1994) (citing Legislative Council Judiciary Committee, Report on the Revised Washington Criminal Code 153 (Dec. 3, 1970).

[14] Numerous States have enacted statutes prohibiting assisting a suicide. See, *e. g.,* Alaska Stat. Ann. § 11.41.120(a)(2) (1996); Ariz. Rev. Stat. Ann. § 13–1103(A)(3) (Supp. 1996–1997); Ark. Code Ann. § 5–10–104(a)(2) (1993); Cal. Penal Code Ann. § 401 (West 1988); Colo. Rev. Stat. § 18–3–104(1)(b) (Supp. 1996); Conn. Gen. Stat. § 53a–56(a)(2) (1997); Del. Code Ann., Tit. 11, § 645 (1995); Fla. Stat. § 782.08 (1991); Ga. Code Ann. § 16–5–5(b) (1996); Haw. Rev. Stat. § 707–702(1)(b) (1993); Ill. Comp. Stat., ch. 720, § 5/12–31 (1993); Ind. Code §§ 35–42–1–2 to 35–42–1–2.5 (1994 and Supp. 1996); Iowa Code Ann. § 707A.2 (West Supp. 1997); Kan. Stat. Ann. § 21–3406 (1995); Ky. Rev. Stat. Ann. § 216.302 (Michie 1994); La. Rev. Stat. Ann. § 14:32.12 (West Supp. 1997); Me. Rev. Stat. Ann., Tit. 17–A, § 204 (1983); Mich. Comp. Laws Ann. § 752.1027 (West Supp. 1997–1998); Minn. Stat. § 609.215 (1996); Miss. Code Ann. § 97–3–49 (1994); Mo. Rev. Stat. § 565.023.1(2) (1994); Mont. Code Ann. § 45–5–105 (1995); Neb. Rev. Stat. § 28–307 (1995); N. H. Rev. Stat. Ann. § 630:4 (1996); N. J. Stat. Ann. § 2C:11–6 (West 1995); N. M. Stat. Ann. § 30–2–4 (1996); N. Y. Penal Law § 120.30 (McKinney 1987); N. D. Cent. Code § 12.1–16–04 (Supp. 1995); Okla. Stat., Tit. 21, §§ 813–815 (1983); Ore. Rev. Stat. § 163.125(1)(b) (1991); Pa. Stat. Ann., Tit. 18, § 2505 (Purdon 1983); R. I. Gen. Laws §§ 11–60–1 through 11–60–5 (Supp. 1996); S. D. Codified Laws § 22–16–37 (1988); Tenn. Code Ann. § 39–13–216 (Supp. 1996); Tex. Penal Code Ann. § 22.08 (1994); Wash. Rev. Code § 9A.36.060 (1994); Wis. Stat. § 940.12 (1993–1994).  See also P. R. Laws Ann., Tit. 33, § 4009 (1984).

life in various circumstances or in the perceived legitimacy of taking one's own. See, *e. g.*, Kamisar, Physician-Assisted Suicide: The Last Bridge to Active Voluntary Euthanasia, in Euthanasia Examined 225, 229 (J. Keown ed. 1995); CeloCruz, Aid-in-Dying: Should We Decriminalize Physician-Assisted Suicide and Physician-Committed Euthanasia?, 18 Am. J. L. & Med. 369, 375 (1992); Marzen, O'Dowd, Crone, & Balch, 24 Duquesne L. Rev., at 98–99. Thus it may indeed make sense for the State to take its hands off suicide as such, while continuing to prohibit the sort of assistance that would make its commission easier. See, *e. g.*, American Law Institute, Model Penal Code § 210.5, Comment 5 (1980). Decriminalization does not, then, imply the existence of a constitutional liberty interest in suicide as such; it simply opens the door to the assertion of a cognizable liberty interest in bodily integrity and associated medical care that would otherwise have been inapposite so long as suicide, as well as assisting a suicide, was a criminal offense.

This liberty interest in bodily integrity was phrased in a general way by then-Judge Cardozo when he said, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body" in relation to his medical needs. *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125, 129, 105 N. E. 92, 93 (1914). The familiar examples of this right derive from the common law of battery and include the right to be free from medical invasions into the body, *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S., at 269–279, as well as a right generally to resist enforced medication, see *Washington* v. *Harper*, 494 U. S. 210, 221–222, 229 (1990). Thus "[i]t is settled now . . . that the Constitution places limits on a State's right to interfere with a person's most basic decisions about . . . bodily integrity." *Casey*, 505 U. S., at 849 (citations omitted); see also *Cruzan*, 497 U. S., at 278; *id.*, at 288 (O'CONNOR, J., concurring); *Washington* v. *Harper, supra*, at 221–222; *Winston* v. *Lee*, 470 U. S. 753, 761–762 (1985); *Rochin* v. *California*, 342

U. S., at 172. Constitutional recognition of the right to bodily integrity underlies the assumed right, good against the State, to require physicians to terminate artificial life support, *Cruzan, supra,* at 279 ("[W]e assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition"), and the affirmative right to obtain medical intervention to cause abortion, see *Casey, supra,* at 857, 896; cf. *Roe* v. *Wade,* 410 U. S., at 153.

It is, indeed, in the abortion cases that the most telling recognitions of the importance of bodily integrity and the concomitant tradition of medical assistance have occurred. In *Roe* v. *Wade,* the plaintiff contended that the Texas statute making it criminal for any person to "procure an abortion," *id.,* at 117, for a pregnant woman was unconstitutional insofar as it prevented her from "terminat[ing] her pregnancy by an abortion 'performed by a competent, licensed physician, under safe, clinical conditions,'" *id.,* at 120, and in striking down the statute we stressed the importance of the relationship between patient and physician, see *id.,* at 153, 156.

The analogies between the abortion cases and this one are several. Even though the State has a legitimate interest in discouraging abortion, see *Casey, supra,* at 871 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *Roe,* 410 U. S., at 162, the Court recognized a woman's right to a physician's counsel and care. Like the decision to commit suicide, the decision to abort potential life can be made irresponsibly and under the influence of others, and yet the Court has held in the abortion cases that physicians are fit assistants. Without physician assistance in abortion, the woman's right would have too often amounted to nothing more than a right to self-mutilation, and without a physician to assist in the suicide of the dying, the patient's right will often be confined to crude methods of causing death, most shocking and painful to the decedent's survivors.

There is, finally, one more reason for claiming that a physician's assistance here would fall within the accepted tradition of medical care in our society, and the abortion cases are only the most obvious illustration of the further point. While the Court has held that the performance of abortion procedures can be restricted to physicians, the Court's opinion in *Roe* recognized the doctors' role in yet another way. For, in the course of holding that the decision to perform an abortion called for a physician's assistance, the Court recognized that the good physician is not just a mechanic of the human body whose services have no bearing on a person's moral choices, but one who does more than treat symptoms, one who ministers to the patient. See *id.*, at 153; see also *Griswold* v. *Connecticut*, 381 U. S., at 482 ("This law . . . operates directly on an intimate relation of husband and wife and their physician's role in one aspect of that relation"); see generally R. Cabot, Ether Day Address, Boston Medical and Surgical J. 287, 288 (1920). This idea of the physician as serving the whole person is a source of the high value traditionally placed on the medical relationship. Its value is surely as apparent here as in the abortion cases, for just as the decision about abortion is not directed to correcting some pathology, so the decision in which a dying patient seeks help is not so limited. The patients here sought not only an end to pain (which they might have had, although perhaps at the price of stupor) but an end to their short remaining lives with a dignity that they believed would be denied them by powerful pain medication, as well as by their consciousness of dependency and helplessness as they approached death. In that period when the end is imminent, they said, the decision to end life is closest to decisions that are generally accepted as proper instances of exercising autonomy over one's own body, instances recognized under the Constitution and the State's own law, instances in which the help of physicians is accepted as falling within the traditional norm.

Respondents argue that the State has in fact already recognized enough evolving examples of this tradition of patient care to demonstrate the strength of their claim. Washington, like other States, authorizes physicians to withdraw life-sustaining medical treatment and artificially delivered food and water from patients who request it, even though such actions will hasten death. See Wash. Rev. Code §§ 70.122.110, 70.122.051 (1994); see generally Notes to Uniform Rights of the Terminally Ill Act, 9B U. L. A. 168–169 (Supp. 1997) (listing state statutes). The State permits physicians to alleviate anxiety and discomfort when withdrawing artificial life-supporting devices by administering medication that will hasten death even further. And it generally permits physicians to administer medication to patients in terminal conditions when the primary intent is to alleviate pain, even when the medication is so powerful as to hasten death and the patient chooses to receive it with that understanding. See Wash. Rev. Code § 70.122.010 (1994); see generally Rousseau, Terminal Sedation in the Care of Dying Patients, 156 Archives of Internal Medicine 1785 (1996); Truog, Berde, Mitchell, & Grier, Barbiturates in the Care of the Terminally Ill, 327 New Eng. J. Med. 1678 (1992).[15]

---

[15] Other States have enacted similar provisions, some categorically authorizing such pain treatment, see, e. g., Ind. Code § 35–42–1–2.5(a)(1) (Supp. 1996) (ban on assisted suicide does not apply to licensed health-care provider who administers or dispenses medications or procedures to relieve pain or discomfort, even if such medications or procedures hasten death, unless provider intends to cause death); Iowa Code Ann. § 707A.3.1 (West Supp. 1997) (same); Ky. Rev. Stat. Ann. § 216.304 (Michie 1997) (same); Minn. Stat. Ann. § 609.215(3) (West Supp. 1997) (same); Ohio Rev. Code Ann. §§ 2133.11(A)(6), 2133.12(E)(1) (1994); R. I. Gen. Laws § 11–60–4 (Supp. 1996) (same); S. D. Codified Laws § 22–16–37.1 (Supp. 1997); see Mich. Comp. Laws Ann. § 752.1027(3) (West Supp. 1997); Tenn. Code Ann. § 39–13–216(b)(2) (1996); others permit patients to sign health-care directives in which they authorize pain treatment even if it hastens death. See, e. g., Me. Rev. Stat. Ann., Tit. 18–A, §§ 5–804, 5–809 (1996); N. M. Stat. Ann. §§ 24–7A–4, 24–7A–9 (Supp. 1995); S. C. Code Ann. § 62–5–504 (Supp. 1996); Va. Code Ann. §§ 54.1–2984, 4.1–2988 (1994).

2

The argument supporting respondents' position thus progresses through three steps of increasing forcefulness. First, it emphasizes the decriminalization of suicide. Reliance on this fact is sanctioned under the standard that looks not only to the tradition retained, but to society's occasional choices to reject traditions of the legal past. See *Poe* v. *Ullman*, 367 U. S., at 542 (Harlan, J., dissenting). While the common law prohibited both suicide and aiding a suicide, with the prohibition on aiding largely justified by the primary prohibition on self-inflicted death itself, see, *e. g.*, American Law Institute, Model Penal Code § 210.5, Comment 1, at 92–93, and n. 7, the State's rejection of the traditional treatment of the one leaves the criminality of the other open to questioning that previously would not have been appropriate. The second step in the argument is to emphasize that the State's own act of decriminalization gives a freedom of choice much like the individual's option in recognized instances of bodily autonomy. One of these, abortion, is a legal right to choose in spite of the interest a State may legitimately invoke in discouraging the practice, just as suicide is now subject to choice, despite a state interest in discouraging it. The third step is to emphasize that respondents claim a right to assistance not on the basis of some broad principle that would be subject to exceptions if that continuing interest of the State's in discouraging suicide were to be recognized at all. Respondents base their claim on the traditional right to medical care and counsel, subject to the limiting conditions of informed, responsible choice when death is imminent, conditions that support a strong analogy to rights of care in other situations in which medical counsel and assistance have been available as a matter of course. There can be no stronger claim to a physician's assistance than at the time when death is imminent, a moral judgment implied by the State's own recognition of the legitimacy of medical procedures necessarily hastening the moment of impending death.

In my judgment, the importance of the individual interest here, as within that class of "certain interests" demanding careful scrutiny of the State's contrary claim, see *Poe, supra*, at 543, cannot be gainsaid. Whether that interest might in some circumstances, or at some time, be seen as "fundamental" to the degree entitled to prevail is not, however, a conclusion that I need draw here, for I am satisfied that the State's interests described in the following section are sufficiently serious to defeat the present claim that its law is arbitrary or purposeless.

B

The State has put forward several interests to justify the Washington law as applied to physicians treating terminally ill patients, even those competent to make responsible choices: protecting life generally, Brief for Petitioners 33, discouraging suicide even if knowing and voluntary, *id.*, at 37–38, and protecting terminally ill patients from involuntary suicide and euthanasia, both voluntary and nonvoluntary, *id.*, at 34–35.

It is not necessary to discuss the exact strengths of the first two claims of justification in the present circumstances, for the third is dispositive for me. That third justification is different from the first two, for it addresses specific features of respondents' claim, and it opposes that claim not with a moral judgment contrary to respondents', but with a recognized state interest in the protection of nonresponsible individuals and those who do not stand in relation either to death or to their physicians as do the patients whom respondents describe. The State claims interests in protecting patients from mistakenly and involuntarily deciding to end their lives, and in guarding against both voluntary and involuntary euthanasia. Leaving aside any difficulties in coming to a clear concept of imminent death, mistaken decisions may result from inadequate palliative care or a terminal prognosis that turns out to be error; coercion and abuse may stem from the large medical bills that family members cannot bear

or unreimbursed hospitals decline to shoulder. Voluntary and involuntary euthanasia may result once doctors are authorized to prescribe lethal medication in the first instance, for they might find it pointless to distinguish between patients who administer their own fatal drugs and those who wish not to, and their compassion for those who suffer may obscure the distinction between those who ask for death and those who may be unable to request it. The argument is that a progression would occur, obscuring the line between the ill and the dying, and between the responsible and the unduly influenced, until ultimately doctors and perhaps others would abuse a limited freedom to aid suicides by yielding to the impulse to end another's suffering under conditions going beyond the narrow limits the respondents propose. The State thus argues, essentially, that respondents' claim is not as narrow as it sounds, simply because no recognition of the interest they assert could be limited to vindicating those interests and affecting no others. The State says that the claim, in practical effect, would entail consequences that the State could, without doubt, legitimately act to prevent.

The mere assertion that the terminally sick might be pressured into suicide decisions by close friends and family members would not alone be very telling. Of course that is possible, not only because the costs of care might be more than family members could bear but simply because they might naturally wish to see an end of suffering for someone they love. But one of the points of restricting any right of assistance to physicians would be to condition the right on an exercise of judgment by someone qualified to assess the patient's responsible capacity and detect the influence of those outside the medical relationship.

The State, however, goes further, to argue that dependence on the vigilance of physicians will not be enough. First, the lines proposed here (particularly the requirement of a knowing and voluntary decision by the patient) would be more difficult to draw than the lines that have limited

other recently recognized due process rights. Limiting a State from prosecuting use of artificial contraceptives by married couples posed no practical threat to the State's capacity to regulate contraceptives in other ways that were assumed at the time of *Poe* to be legitimate; the trimester measurements of *Roe* and the viability determination of *Casey* were easy to make with a real degree of certainty. But the knowing and responsible mind is harder to assess.[16] Second, this difficulty could become the greater by combining with another fact within the realm of plausibility, that physicians simply would not be assiduous to preserve the line. They have compassion, and those who would be willing to assist in suicide at all might be the most susceptible to the wishes of a patient, whether the patient was technically quite responsible or not. Physicians, and their hospitals, have their own financial incentives, too, in this new age of managed care. Whether acting from compassion or under

---

[16] While it is also more difficult to assess in cases involving limitations on life incidental to pain medication and the disconnection of artificial life support, there are reasons to justify a lesser concern with the punctilio of responsibility in these instances. The purpose of requesting and giving the medication is presumably not to cause death but to relieve the pain so that the State's interest in preserving life is not unequivocally implicated by the practice; and the importance of pain relief is so clear that there is less likelihood that relieving pain would run counter to what a responsible patient would choose, even with the consequences for life expectancy. As for ending artificial life support, the State again may see its interest in preserving life as weaker here than in the general case just because artificial life support preserves life when nature would not; and, because such life support is a frequently offensive bodily intrusion, there is a lesser reason to fear that a decision to remove it would not be the choice of one fully responsible. Where, however, a physician writes a prescription to equip a patient to end life, the prescription is written to serve an affirmative intent to die (even though the physician need not and probably does not characteristically have an intent that the patient die but only that the patient be equipped to make the decision). The patient's responsibility and competence are therefore crucial when the physician is presented with the request.

some other influence, a physician who would provide a drug for a patient to administer might well go the further step of administering the drug himself; so, the barrier between assisted suicide and euthanasia could become porous, and the line between voluntary and involuntary euthanasia as well.[17] The case for the slippery slope is fairly made out here, not because recognizing one due process right would leave a court with no principled basis to avoid recognizing another, but because there is a plausible case that the right claimed would not be readily containable by reference to facts about the mind that are matters of difficult judgment, or by gate-keepers who are subject to temptation, noble or not.

Respondents propose an answer to all this, the answer of state regulation with teeth.   Legislation proposed in several States, for example, would authorize physician-assisted suicide but require two qualified physicians to confirm the patient's diagnosis, prognosis, and competence; and would mandate that the patient make repeated requests witnessed by at least two others over a specified timespan; and would impose reporting requirements and criminal penalties for various acts of coercion.   See App. to Brief for State Legislators as *Amici Curiae* 1a–2a.

But at least at this moment there are reasons for caution in predicting the effectiveness of the teeth proposed.   Respondents' proposals, as it turns out, sound much like the guidelines now in place in the Netherlands, the only place where experience with physician-assisted suicide and euthanasia has yielded empirical evidence about how such regulations might affect actual practice.   Dutch physicians must engage in consultation before proceeding, and must decide whether the patient's decision is voluntary, well considered, and stable, whether the request to die is enduring and made more than once, and whether the patient's future will involve

---

[17] Again, the same can be said about life support and shortening life to kill pain, but the calculus may be viewed as different in these instances, as noted just above.

unacceptable suffering. See C. Gomez, Regulating Death 40–43 (1991). There is, however, a substantial dispute today about what the Dutch experience shows. Some commentators marshall evidence that the Dutch guidelines have in practice failed to protect patients from involuntary euthanasia and have been violated with impunity. See, *e. g.*, H. Hendin, Seduced By Death 75–84 (1997) (noting many cases in which decisions intended to end the life of a fully competent patient were made without a request from the patient and without consulting the patient); Keown, Euthanasia in the Netherlands: Sliding Down the Slippery Slope?, in Euthanasia Examined 261, 289 (J. Keown ed. 1995) (guidelines have "proved signally ineffectual; non-voluntary euthanasia is now widely practised and increasingly condoned in the Netherlands"); Gomez, *supra*, at 104–113. This evidence is contested. See, *e. g.*, R. Epstein, Mortal Peril 322 (1997) ("Dutch physicians are not euthanasia enthusiasts and they are slow to practice it in individual cases"); R. Posner, Aging and Old Age 242, and n. 23 (1995) (noting fear of "doctors' rushing patients to their death" in the Netherlands "has not been substantiated and does not appear realistic"); Van der Wal, Van Eijk, Leenen, & Spreeuwenberg, Euthanasia and Assisted Suicide, 2, Do Dutch Family Doctors Act Prudently?, 9 Family Practice 135 (1992) (finding no serious abuse in Dutch practice). The day may come when we can say with some assurance which side is right, but for now it is the substantiality of the factual disagreement, and the alternatives for resolving it, that matter. They are, for me, dispositive of the due process claim at this time.

I take it that the basic concept of judicial review with its possible displacement of legislative judgment bars any finding that a legislature has acted arbitrarily when the following conditions are met: there is a serious factual controversy over the feasibility of recognizing the claimed right without at the same time making it impossible for the State to engage in an undoubtedly legitimate exercise of power; facts

necessary to resolve the controversy are not readily ascertainable through the judicial process; but they are more readily subject to discovery through legislative factfinding and experimentation. It is assumed in this case, and must be, that a State's interest in protecting those unable to make responsible decisions and those who make no decisions at all entitles the State to bar aid to any but a knowing and responsible person intending suicide, and to prohibit euthanasia. How, and how far, a State should act in that interest are judgments for the State, but the legitimacy of its action to deny a physician the option to aid any but the knowing and responsible is beyond question.

The capacity of the State to protect the others if respondents were to prevail is, however, subject to some genuine question, underscored by the responsible disagreement over the basic facts of the Dutch experience. This factual controversy is not open to a judicial resolution with any substantial degree of assurance at this time. It is not, of course, that any controversy about the factual predicate of a due process claim disqualifies a court from resolving it. Courts can recognize captiousness, and most factual issues can be settled in a trial court. At this point, however, the factual issue at the heart of this case does not appear to be one of those. The principal enquiry at the moment is into the Dutch experience, and I question whether an independent front-line investigation into the facts of a foreign country's legal administration can be soundly undertaken through American courtroom litigation. While an extensive literature on any subject can raise the hopes for judicial understanding, the literature on this subject is only nascent. Since there is little experience directly bearing on the issue, the most that can be said is that whichever way the Court might rule today, events could overtake its assumptions, as experimentation in some jurisdictions confirmed or discredited the concerns about progression from assisted suicide to euthanasia.

Legislatures, on the other hand, have superior opportunities to obtain the facts necessary for a judgment about the present controversy. Not only do they have more flexible mechanisms for factfinding than the Judiciary, but their mechanisms include the power to experiment, moving forward and pulling back as facts emerge within their own jurisdictions. There is, indeed, good reason to suppose that in the absence of a judgment for respondents here, just such experimentation will be attempted in some of the States. See, e. g., Ore. Rev. Stat. § 127.800 et seq. (Supp. 1996); App. to Brief for State Legislators as Amici Curiae 1a (listing proposed statutes).

I do not decide here what the significance might be of legislative foot dragging in ascertaining the facts going to the State's argument that the right in question could not be confined as claimed. Sometimes a court may be bound to act regardless of the institutional preferability of the political branches as forums for addressing constitutional claims. See, e. g., Bolling v. Sharpe, 347 U. S. 497 (1954). Now, it is enough to say that our examination of legislative reasonableness should consider the fact that the Legislature of the State of Washington is no more obviously at fault than this Court is in being uncertain about what would happen if respondents prevailed today. We therefore have a clear question about which institution, a legislature or a court, is relatively more competent to deal with an emerging issue as to which facts currently unknown could be dispositive. The answer has to be, for the reasons already stated, that the legislative process is to be preferred. There is a closely related further reason as well.

One must bear in mind that the nature of the right claimed, if recognized as one constitutionally required, would differ in no essential way from other constitutional rights guaranteed by enumeration or derived from some more definite textual source than "due process." An unenumerated right should not therefore be recognized, with the effect

of displacing the legislative ordering of things, without the assurance that its recognition would prove as durable as the recognition of those other rights differently derived. To recognize a right of lesser promise would simply create a constitutional regime too uncertain to bring with it the expectation of finality that is one of this Court's central obligations in making constitutional decisions. See *Casey*, 505 U. S., at 864–869.

Legislatures, however, are not so constrained. The experimentation that should be out of the question in constitutional adjudication displacing legislative judgments is entirely proper, as well as highly desirable, when the legislative power addresses an emerging issue like assisted suicide. The Court should accordingly stay its hand to allow reasonable legislative consideration. While I do not decide for all time that respondents' claim should not be recognized, I acknowledge the legislative institutional competence as the better one to deal with that claim at this time.

JUSTICE GINSBURG, concurring in the judgments.*

I concur in the Court's judgments in these cases substantially for the reasons stated by JUSTICE O'CONNOR in her concurring opinion, *ante*, p. 736.

JUSTICE BREYER, concurring in the judgments.†

I believe that JUSTICE O'CONNOR's views, which I share, have greater legal significance than the Court's opinion suggests. I join her separate opinion, except insofar as it joins the majority. And I concur in the judgments. I shall briefly explain how I differ from the Court.

I agree with the Court in *Vacco* v. *Quill, post*, at 800–809, that the articulated state interests justify the distinction

---

*[This opinion applies also to No. 95–1858, *Vacco et al.* v. *Quill et al., post*, p. 793.]

†[This opinion applies also to No. 95–1858, *Vacco et al.* v. *Quill et al., post*, p. 793.]

drawn between physician assisted suicide and withdrawal of life support. I also agree with the Court that the critical question in both of the cases before us is whether "the 'liberty' specially protected by the Due Process Clause includes a right" of the sort that the respondents assert. *Washington* v. *Glucksberg, ante,* at 723. I do not agree, however, with the Court's formulation of that claimed "liberty" interest. The Court describes it as a "right to commit suicide with another's assistance." *Ante,* at 724. But I would not reject the respondents' claim without considering a different formulation, for which our legal tradition may provide greater support. That formulation would use words roughly like a "right to die with dignity." But irrespective of the exact words used, at its core would lie personal control over the manner of death, professional medical assistance, and the avoidance of unnecessary and severe physical suffering—combined.

As JUSTICE SOUTER points out, *ante,* at 762–765 (opinion concurring in judgment), Justice Harlan's dissenting opinion in *Poe* v. *Ullman,* 367 U. S. 497 (1961), offers some support for such a claim. In that opinion, Justice Harlan referred to the "liberty" that the Fourteenth Amendment protects as including "a freedom from all substantial arbitrary impositions and purposeless restraints" and also as recognizing that "*certain interests* require particularly careful scrutiny of the state needs asserted to justify their abridgment." *Id.,* at 543. The "certain interests" to which Justice Harlan referred may well be similar (perhaps identical) to the rights, liberties, or interests that the Court today, as in the past, regards as "fundamental." *Ante,* at 720; see also *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992); *Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *Rochin* v. *California,* 342 U. S. 165 (1952); *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535 (1942).

Justice Harlan concluded that marital privacy was such a "special interest." He found in the Constitution a right of "privacy of the home"—with the home, the bedroom, and "intimate details of the marital relation" at its heart—by examining the protection that the law had earlier provided for related, but not identical, interests described by such words as "privacy," "home," and "family." 367 U. S., at 548, 552; cf. *Casey, supra,* at 851. The respondents here essentially ask us to do the same. They argue that one can find a "right to die with dignity" by examining the protection the law has provided for related, but not identical, interests relating to personal dignity, medical treatment, and freedom from state-inflicted pain. See *Ingraham* v. *Wright,* 430 U. S. 651 (1977); *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261 (1990); *Casey, supra.*

I do not believe, however, that this Court need or now should decide whether or a not such a right is "fundamental." That is because, in my view, the avoidance of severe physical pain (connected with death) would have to constitute an essential part of any successful claim and because, as JUSTICE O'CONNOR points out, the laws before us do not *force* a dying person to undergo that kind of pain. *Ante,* at 736–737 (concurring opinion). Rather, the laws of New York and of Washington do not prohibit doctors from providing patients with drugs sufficient to control pain despite the risk that those drugs themselves will kill. Cf. New York State Task Force on Life and the Law, When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context 163, n. 29 (May 1994). And under these circumstances the laws of New York and Washington would overcome any remaining significant interests and would be justified, regardless.

Medical technology, we are repeatedly told, makes the administration of pain-relieving drugs sufficient, except for a very few individuals for whom the ineffectiveness of pain control medicines can mean not pain, but the need for seda-

tion which can end in a coma. Brief for National Hospice Organization 8; Brief for American Medical Association (AMA) et al. as *Amici Curiae* 6; see also Byock, Consciously Walking the Fine Line: Thoughts on a Hospice Response to Assisted Suicide and Euthanasia, 9 J. Palliative Care 25, 26 (1993); New York State Task Force, at 44, and n. 37. We are also told that there are many instances in which patients do not receive the palliative care that, in principle, is available, *id.*, at 43–47; Brief for AMA as *Amici Curiae* 6; Brief for Choice in Dying, Inc., as *Amici Curiae* 20, but that is so for institutional reasons or inadequacies or obstacles, which would seem possible to overcome, and which do *not* include *a prohibitive set of laws.* *Ante,* at 736–737 (O'CONNOR, J., concurring); see also 2 House of Lords, Session 1993–1994 Report of Select Committee on Medical Ethics 113 (1994) (indicating that the number of palliative care centers in the United Kingdom, where physician assisted suicide is illegal, significantly exceeds that in the Netherlands, where such practices are legal).

This legal circumstance means that the state laws before us do not infringe directly upon the (assumed) central interest (what I have called the core of the interest in dying with dignity) as, by way of contrast, the state anticontraceptive laws at issue in *Poe* did interfere with the central interest there at stake—by bringing the State's police powers to bear upon the marital bedroom.

Were the legal circumstances different—for example, were state law to prevent the provision of palliative care, including the administration of drugs as needed to avoid pain at the end of life—then the law's impact upon serious and otherwise unavoidable physical pain (accompanying death) would be more directly at issue. And as JUSTICE O'CONNOR suggests, the Court might have to revisit its conclusions in these cases.